1  Michael Gerard Fletcher (State Bar No. 070849)
     mfletcher@frandzel.com
2  Bernard R. Given II (State Bar No. 134718)
     bgiven@frandzel.com
3  Michael J. Gomez (State Bar No. 251571)
     mgomez@frandzel.com
4  FRANDZEL ROBINS BLOOM & CSATO, L.C.
   6500 Wilshire Boulevard, Seventeenth Floor
5  Los Angeles, California 90048-4920
   Telephone: (323) 852-1000
6  Facsimile: (323) 651-2577

7  Attorneys for Secured Creditor Cathay Bank

8
                   **UNITED STATES BANKRUPTCY COURT**
9
                   **NORTHERN DISTRICT OF CALIFORNIA**
10
                        **SAN JOSE DIVISION**
11
   In re                              | CASE No. 10-60373
12
   CHINA VILLAGE, LLC,                | Chapter 11
13
              Debtor.                 | **CATHAY BANK'S OPPOSITION AND
14                                       OBJECTIONS TO CONFIRMATION;
                                         AND MEMORANDUM OF POINTS AND
15                                       AUTHORITIES IN SUPPORT THEREOF**

16
                                        DATE:   June 28, 2011 (Status Conference)
17                                      TIME:   2:00 p.m.
                                        CTRM:  3020
18                                              280 South First Street, Third Floor
                                                San Jose, CA 95113
19

20

21

22

23

24

25

26

27

28

# CONTENTS

I. INTRODUCTION ............................................................................................................ 2

II. FACTUAL BACKGROUND ............................................................................................ 3

III. SUMMARY OF ARGUMENT ......................................................................................... 4

IV. ARGUMENT .................................................................................................................... 5
    A. BURDEN OF PROOF ........................................................................................... 5
    B. THE PLAN IS NOT FEASIBLE AS REQUIRED BY 11 U.S.C. §
       1129(a)(11) FOR LACK OF CASH, SALES, AND FINANCING
       COMMITMENTS ................................................................................................... 6
    C. THE PLAN DOES NOT COMPLY WITH THE APPLICABLE
       PROVISIONS OF TITLE 11 AS REQUIRED BY 11 U.S.C. § 1129(a)(1) ............ 8
    D. THE PLAN IS UNFAIR AND INEQUITABLE IN VIOLATION OF 11
       U.S.C. § 1129(b)(2)(A) ......................................................................................... 9
       1. The Plan is Unfair and Inequitable Because It Negatively Amortizes
          the Bank's Secured Claim ......................................................................... 9
       2. The Plan is Unfair and Inequitable Because it Does Not Satisfy 11
          U.S.C. § 1129(b)(2)(A)(i), (ii), or (iii). .................................................. 12
    E. THE PLAN IS UNFAIR AND INEQUITABLE IN VIOLATION OF 11
       U.S.C. § 1129(b)(2)(B) ....................................................................................... 17
    F. THE PLAN UNFAIRLY DISCRIMINATES AGAINST CATHAY'S
       UNSECURED CLAIM ......................................................................................... 19
    G. BECAUSE THE PLAN IS NOT CONFIRMABLE AS A MATTER OF
       LAW, THE COURT MUST GRANT RELIEF FROM THE AUTOMATIC
       STAY PURSUANT TO 11 U.S.C. § 362(d)(3) .................................................... 20

V. CONCLUSION ................................................................................................................ 21

# TABLE OF AUTHORITIES

**FEDERAL CASES**

Page(s)

*Bank of America Nat'l Trust and Sav. Ass'n v. 203 North LaSalle Street P'ship*,
526 U.S. 434 (1999) ................................................................................................ 18

*Case v. Los Angeles Lumber Prods. Co.*,
308 U.S. 106 (1939) ................................................................................................ 18

*Great Western Bank v. Sierra Woods Group*,
953 F.2d 1174 (9th Cir. 1992) ..................................................................... 2, 10, 11

*H & M Parmely Farms v. Farmers Home Admin.*,
127 B.R. 644 (D.S.D. 1990) .................................................................................... 14

*In re 641 Assocs., Ltd.*,
140 B.R. 619 (Bankr. E.D. Pa. 1992) ............................................................... 10, 11

*In re A Partners, LLC*,
344 B.R. 114 (Bankr. E.D. Cal. 2006) ...................................................................... 6

*In re Ambanc La Mesa Ltd. P'ship*,
115 F.3d 650 (9th Cir. 1997) ..................................................................................... 6

*In re American Homepatient, Inc.*,
420 F3d 559 (6th Cir. 2005) ................................................................................... 13

*In re Apple Tree Partners, L.P.*,
131 B.R. 380 (Bankr. W.D. Tenn. 1991). ............................................................... 11

*In re Arnold & Baker Farms*,
177 B.R. 648 (B.A.P. 9th Cir. 1994) ................................................................... 5, 16

*In re Arnold & Baker Farms*,
85 F.3d 1415 (9th Cir. 1996) ....................................................................... 15, 16, 17

*In re Arnold*,
806 F.2d 937 (9th Cir. 1986) ................................................................................... 13

*In re Bonner Mall P'ship*,
2 F.3d 899 (9th Cir. 1992) ....................................................................................... 18

*In re Boulders on the River, Inc.*,
164 B.R. 99 (B.A.P. 9th Cir. 1994) ......................................................................... 13

*In re California Hancock, Inc.*,
88 B.R. 226 (B.A.P. 9th Cir. 1988) ......................................................................... 14

854908.1 | 023000-0724

ii

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

*In re Calvanese*,
169 B.R. 104 (Bankr. E.D. Pa. 1994) ....................................................................... 6, 12

*In re CBJ Development, Inc.*,
202 B.R. 467 (B.A.P. 9th Cir. 1996) .......................................................................... 20

*In re Consolidated Props. Limited P'ship*,
170 B.R. 93 (Bankr. D. Md. 1994) ............................................................................ 10

*In re Georgetown Park Apartments*,
103 B.R. 248 (Bankr. S.D. Cal. 1989) ................................................................... 14, 15

*In re Golf, L.L.C.*,
322 B.R. 874 (Bankr. D. Neb. 2004) ........................................................................... 9

*In re Haardt*,
65 B.R. 697 (Bankr. E.D. Pa. 1986) ............................................................................ 6

*In re Heather Apartments Ltd. P'ship*,
366 B.R. 45 (Bankr. D. Minn. 2007) ......................................................................... 20

*In re Hoffman*,
52 B.R. 212 (Bankr. N.D. 1985) .................................................................................. 7

*In re Howard*,
212 B.R. 864 (Bankr. E.D. Tenn. 1997) .................................................................... 10

*In re LDN Corp.*,
191 B.R. 320 (Bankr. E.D. Va. 1996) ........................................................................ 20

*In re Made in Detroit, Inc.*,
299 B.R. 170 (Bankr. E.D. Mich. 2003) ...................................................................... 6

*In re Memphis*,
99 B.R. 385 (Bankr. M.D. Tenn. 1989) ...................................................................... 10

*In re Miami Center Assocs., Ltd.*,
144 B.R. 937 (Bankr. S.D. Fla. 1992) ........................................................................ 19

*In re Monarch Beach Venture, Ltd.*,
166 B.R. 428 (C.D. Cal. 1993) ................................................................................... 14

*In re Murel Holding Corp.*,
75 F.2d 941 (2d Cir. 1935) ........................................................................... 15, 16, 17

*In re North Valley Mall, LLC*,
2010 Bankr. LEXIS 1927 (Bankr. C.D. Cal. 2010) .................................................... 13

*In re Oaks Partners, Ltd.*,
141 B.R. 453 (Bankr. N.D. Ga. 1992) ................................................................... 10, 11

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

854908.1 | 023000-0724

iii

*In re Ralph C. Tyler, P.E., P.S., Inc.,*
  156 B.R. 995 (Bankr. N.D. Ohio 1993) ................................................................. 6

*In re Realty Invest., Ltd. V,*
  72 B.R. 143 (Bankr. C.D. Cal. 1987) ................................................................. 14

*In re Stegall,*
  85 B.R. 510 (C.D. Ill. 1987), *aff'd*, 865 F.2d 140 (7th Cir. 1989).......................... 19

*In re Stratford Assocs. Ltd. P'ship,*
  145 B.R. 689 (Bankr. D. Kan. 1992)..................................................................... 7

*In re Swiftco, Inc.,*
  1988 Bankr. LEXIS 2251 (Bankr. S.D. Tex. 1988) ............................................... 15

*In re Walker,*
  165 B.R. 994 (E.D. Va. 1994) ................................................................................ 6

*In re Western Real Estate Fund, Inc.,*
  75 B.R. 580 (Bankr. W.D. Okla. 1987) ................................................................. 15

*In re Wynnefield Manor Assocs., L.P.,*
  163 B.R. 53 (Bankr. E.D. Pa. 1993) ............................................................... 10, 12

*In re Yasparro,*
  100 B.R. 91 (Bankr. M.D. Fla. 1989).................................................................... 19

*Norwest Bank Worthington v. Ahlers,*
  485 U.S. 197 (1988) .............................................................................................. 18

*Norwest Bank Worthington v. Ahlers,*
  485 U.S. 197 (1988) ........................................................................................ 17, 18

*Pizza of Hawaii v. Shakey's, Inc. (In re Pizza of Hawaii, Inc.),*
  761 F.2d 1374 (9th Cir. 1985)................................................................................. 6

*Till v. SCS Credit Corp.,*
  124 S.Ct. 1951 (2004) ........................................................................................... 13

*U.S. Bancorp Mortg. Co. v. Bonner Mall P'ship,*
  513 U.S. 18 (1994) ................................................................................................ 18

**FEDERAL STATUTES**

11 U.S.C. § 101 ......................................................................................... 3, 5, 6, 20

11 U.S.C. § 362(d)(3) ............................................................................................ 20

11 U.S.C. § 506(a)(1) ............................................................................................ 13

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

854908.1 | 023000-0724

11 U.S.C. § 1128(b) ...................................................................................................... 2

11 U.S.C. § 1129 ........................................................................................................... 15

11 U.S.C. § 1129(a)(3) .................................................................................................. 8

11 U.S.C. § 1129(a)(11) ............................................................................................ 6, 7

11 U.S.C. § 1129(b)(2)(A) ............................................................................................ 9

11 U.S.C. § 1129(b)(2)(B) .......................................................................................... 17

U.S.C. § 1129(b)(2)(A)(i), (ii), (iii)....................................................................... 12, 17

**OTHER AUTHORITIES**

Gary W. Marsch and Matthew M. Weiss, *Chapter 11 Interest Rates After Till*, 84 AM.
    BANKR. L.J., 209, 213 (2010).............................................................................. 13

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

**TO THE HONORABLE ARTHUR S. WEISSBRODT, UNITED STATES BANKRUPTCY JUDGE:**

Cathay Bank ("<u>Cathay</u>") submits this Opposition and Objections to the Confirmation of the Debtor's Modified Chapter 11 Plan of Reorganization (Dated March 18, 2011) (the "<u>Plan</u>"), filed by China Village, LLC (the "<u>Debtor</u>"), on or about March 18, 2011, in accordance with 11 U.S.C. § 1128(b). In support of its Objections, Cathay respectfully represents the following:

MEMORANDUM OF POINTS AND AUTHORITIES

## I.     INTRODUCTION

The Plan is premised upon keeping Cathay at bay for five years or more until the real estate markets rebound. The Plan states: (1) overhead expenses, repairs, leasing commissions, and Cathay's interest payments will be paid from operating revenue and $1 million from Redwood Mortgage ("<u>Redwood</u>"); and (2) Cathay's principal will be repaid in three to five (*or more*) years from either a sale of the Property,[1] a refinancing of the Property, or capital contributions from new investors or the Debtor's current equity holders.

In order to access $1 million from Redwood, to be paid by Redwood over three years, the Debtor must at least have 50% of the Property leased within 18 months. Yet, while Redwood has no obligation to fund any additional monies after 36 months, the Debtor must achieve a 75% occupancy rate as of the 36th month lest Redwood discontinue funding. In light of these financing hurdles, the Debtor has had a high vacancy rate at the Property and needs to perform substantial repairs at the Property in order to fully lease it.

Based upon Cathay and Redwood's proofs of claim, the Debtor seeks to restructure over $41 million worth of debt. There should be sophisticated financial modeling of the expected post-

---

[1] The Property means the definition ascribed by the Debtor in the Plan, the real property commonly known as 40525, 40451-40495, and 40505 – 40545 Albrae Street, and 5950 – 6016 and 5960 Stevenson Boulevard.

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

1  confirmation cash flows, both revenues and expenses. There should be comprehensive evidence
2  of post-confirmation adequate protection for Cathay and how Cathay will not be harmed by with
3  interest-only payments while junior stakeholders are paid. No such evidence has been provided
4  though.

5       In all fairness, Cathay is entitled to more. Nevertheless, Cathay is prepared to demonstrate
6  in detail why the Debtor is in actuality proposing a "visionary scheme," in the words of the Ninth
7  Circuit Court of Appeals, one that shifts all of the risk of failure onto Cathay. Cathay will point
8  out the significant risks inherent in the Plan. Cathay will outline the fallacies in the Debtor's
9  assumptions that it will be able to refinance or sell the Property in a few short years to repay all
10  creditors in full. The Plan dangerously increases the material risks to Cathay. Confirmation
11  should be denied.

12

13  **II.    FACTUAL BACKGROUND**

14       The Debtor is a single asset real estate entity that owns commercial buildings acquired for
15  redevelopment to be tied into a planned, internationally-themed shopping center known as "The
16  Globe." Cathay loaned the Debtor roughly $22.3 million which is secured by a first lien on the
17  Property and all accessions, attachments, products, produce, and rents from the Property (the
18  "Loan"). After two extensions of the maturity date of the Loan, the Debtor defaulted by failing to
19  repay the Loan on the extended maturity date of January 5, 2009.

20       Cathay commenced a judicial foreclosure action against the Debtor on June 1, 2009 in the
21  Superior Court of California for Alameda County (the "State Court") and simultaneously pursued
22  a non-judicial foreclosure sale. The State Court appointed Robb Evans & Associates LLC as the
23  receiver over the Property. The Receiver managed the Property for over a year until the Debtor
24  filed a voluntary petition for relief under Chapter 11 of 11 U.S.C. § 101, *et seq.* (the "Bankruptcy
25  Code"), on October 4, 2010.

26       According to the Debtor's Schedule F, the Debtor owes $1,233,691 in undisputed,
27  liquidated, non-contingent unsecured claims. The lone unsecured creditor whose claim the Debtor
28  disputed, asserts a claim of $264,643.84. In total, the unsecured claims amount to approximately

854908.1 | 023000-0724

3

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 Wilshire Boulevard, 17th Floor
Los Angeles, California 90048-4920
(323) 852-1000

1   $1.55 million as supplemented by the proofs of claim filed. The County of Alameda filed several

2   claims secured by the Property, but according to the Plan, the Debtor is current with these taxes.

3   Redwood claims it is owed about $19.25 million. There are two other purported junior lienholders

4   who are each owed $1 million.

5

6   **III.    SUMMARY OF ARGUMENT**

7          There are number of confirmation defects in the Plan, including:

8          1.      The Plan is not feasible;

9          2.      The Plan violates various provisions of the Bankruptcy Code;

10         3.      The Plan unfairly discriminates against Cathay's claim; and

11         4.      The Plan is not fair and equitable, for among other reasons, because it negatively

12                 amortizes Cathay's claim.

13         Thus, the Court should not confirm the Plan.

14         The Plan proposes to use Cathay's cash collateral and a conditional $1 million in financing

15  from Redwood to make repairs to the Property, pay leasing commissions, keep expenses current,

16  and pay interest-only in the amount of 2% over the one year LIBOR rate to Cathay for three years

17  while the Debtor seeks to sell the Property, refinance the Property, or obtain equity contributions

18  from new or existing members to pay all claims in full. At the Debtor's option, the Debtor can

19  extend its time to seek to sell the Property, refinance it, or obtain an equity contribution for an

20  additional two years or more.

21         The Debtor did not provide firm commitments for its projected sale of the Property, the

22  refinancing, or the ability of its members to contribute capital in excess of $40 million.

23  Furthermore, as a condition to accessing Redwood's $1 million in financing, the Debtor must lease

24  over 50% of the Property. The Debtor has not shown how it is going to reach this target; pay the

25  leasing commissions involved in achieving this goal; repair the Property; make the improvements

26  prospective tenants may require from the Debtor; fund the Debtor's costs in evicting non-paying

27  tenants; and provide the mechanism necessary to ensure the Debtor does not simply lease large

28  swaths of the Property at below market rates to meet the 50% benchmark and access funds, solely

854908.1 | 023000-0724

4

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

1 for the Plan to fail due to the low lease rates. The feasibility of the Plan consequently remains

2 suspect.

3       The Plan is not fair and equitable because it negatively amortizes Cathay's senior secured

4 claim. Negative amortization plans are *highly disfavored*, carefully scrutinized, and rarely

5 approved. Here, the majority of the relevant factors considered by bankruptcy courts

6 overwhelmingly support rejection of the Plan. The negative amortization is particularly egregious

7 because the Debtor fails to provide for safeguards to protect Cathay should the Plan fail, which is

8 likely to occur.

9       To the extent that Cathay is undersecured and the class of general, unsecured claims votes

10 against the Plan, the Plan is not fair and equitable towards the Cathay's unsecured claim either.

11 First, the Debtor's equity holders are not contributing anything to the estate yet will retain their

12 interests in the Debtor under the Plan. There is no "new value." By providing that the Debtor's

13 principals retain their interests in the Debtor—property—the Plan violates the absolute priority

14 rule. Second, if Cathay is undersecured, then junior lienholders who are likewise undersecured,

15 like Redwood and the two lienholders classified in Classes C-4 and C-5, should not be paid in

16 advance or receive any preferential treatment for their unsecured claims. This treatment not only

17 violates the absolute priority rule, but it unfairly discriminates between Cathay's unsecured claim

18 (and the unsecured claims of all other unsecured creditors) and the unsecured claims of Redwood

19 and the lienholders in Classes C-4 and C-5.

20

21 **IV.   ARGUMENT**

22       **A.    BURDEN OF PROOF**

23       Cathay objects to confirmation on the grounds that the Debtor cannot satisfy various

24 provisions of sections 1129(a) and 1129(b). Plan proponents bear the burden of proving that

25 sections 1129(a) - (b) are met. *In re Arnold & Baker Farms,* 177 B.R. 648, 654 (B.A.P. 9th Cir.

26 1994) ("The debtor carries the burden of proving that a Chapter 11 plan complies with the

27 statutory requirements for .§§ 1129(a) & (b).") Nevertheless, bankruptcy courts have an

28 affirmative duty to ensure plans of reorganization satisfy all of the requirements of section

854908.1 | 023000-0724                                        5

1 | 1129(a). *In re Ambanc La Mesa Ltd. P'ship*, 115 F.3d 650, 653 (9th Cir. 1997). The Debtor

2 | cannot carry its burden of proof here as discussed below.

3 | **B.** **THE PLAN IS NOT FEASIBLE AS REQUIRED BY 11 U.S.C. § 1129(a)(11)**

4 | **FOR LACK OF CASH, SALES, AND FINANCING COMMITMENTS**

5 | A debtor must establish that "[c]onfirmation of the plan is not likely to be followed by the

6 | liquidation, or the need for further financial reorganization, of the debtor or any successor to the

7 | debtor under the plan, unless such liquidation or reorganization is proposed in the plan." 11

8 | U.S.C. § 1129(a)(11). "The purpose of section 1129(a)(11) is to prevent confirmation of visionary

9 | schemes which promise creditors and equity security holders more under a proposed plan than the

10 | debtor can possibly attain after confirmation." *Pizza of Hawaii v. Shakey's, Inc. (In re Pizza of

11 | Hawaii, Inc.)*, 761 F.2d 1374, 1382 (9th Cir. 1985) (quoting 5 Collier on Bankruptcy ¶

12 | 1129.02[11] at 1129-34 (15th ed. 1984)); *see also In re A Partners, LLC*, 344 B.R. 114, 126

13 | (Bankr. E.D. Cal. 2006).

14 | Bankruptcy courts have routinely rejected chapter 11 plans that hold creditors in abeyance

15 | without payment while the debtor attempts to sell real estate or obtain financing, which the debtor

16 | was previously unable to do. *See, e.g., In re Calvanese*, 169 B.R. 104, 107-108 (Bankr. E.D. Pa.

17 | 1994) (collecting cases and rejecting a plan that allowed the debtor six months to sell real

18 | property); *In re Haardt*, 65 B.R. 697, 700-702 (Bankr. E.D. Pa. 1986) (rejecting a plan providing

19 | the debtor with 120 days to obtain refinancing, which the debtor had been unable to do for 2

20 | years). "[S]uch plans are nothing more than speculative ventures which place all the risk on the

21 | respective secured creditors, and, therefore, are not feasible." *In re Calvanese*, 169 B.R. at 107-

22 | 108 (internal citations omitted).

23 | Similarly, bankruptcy courts have rejected plans that lack firm commitments of the sales or

24 | financing necessary to fund the plan and repay creditors. *See, e.g., In re Ralph C. Tyler, P.E.,

25 | P.S., Inc.*, 156 B.R. 995, 997 (Bankr. N.D. Ohio 1993) (holding that a plan is not feasible "without

26 | a firm commitment of financing…"); *In re Made in Detroit, Inc.*, 299 B.R. 170, 176-177 (Bankr.

27 | E.D. Mich. 2003) (rejecting a plan contingent on exit financing that was not reasonably likely to

28 | close); *In re Walker*, 165 B.R. 994, 1005 (E.D. Va. 1994) (rejecting a plan to be funded through

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

6

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

1  the sale of real property because the plan failed to provide specifics regarding the proposed sale);

2  *In re Hoffman*, 52 B.R. 212, 215 (Bankr. N.D. 1985) (finding that § 1129(a)(11) was not satisfied

3  because the proposed sale was not "sufficiently concrete" to assure consummation within the time

4  specified in the plan); *In re Stratford Assocs. Ltd. P'ship*, 145 B.R. 689, 699 (Bankr. D. Kan. 1992)

5  ("[W]ithout proper funding in place or a firm commitment of such funding, the Court cannot find

6  the plan feasible.").

7      Courts repeatedly hold that plans that rely exclusively on the sale of real estate are

8  "inherently speculative and invite close judicial scrutiny of the assumptions underlying the plan."

9  *In re Investors Florida Aggressive Growth Fund, Ltd.,* 168 B.R. 760 (Bankr. N.D. Fla. 1994).  For

10 instance, in *Investors Florida Aggressive Growth Fund,* the court highlighted that the debtor had

11 not indentified a buyer with cash resources willing to purchase the property, but simply offered its

12 belief that the market would support its pricing. *Id.* at 766; *see also In re Trail's End Lodge, Inc.,*

13 54 B.R. 898, 901 (Bankr. D. Vt. 1985 ) (plan did not meet feasibility test where asset sales would

14 have to yield "top dollar" to fund the plan).

15     Courts that approve plans funded by the sale of real estate do so only in incredibly limited

16 situations where there are additional assurances of feasibility such as (i) an alternative method to

17 fund the plan or (ii) an indentified buyer with available financing.  *In re Mt. Vernon Plaza*

18 *Community Urban Redevelopment Corp.* I, 79 B.R. 306, 309-310 (Bankr. S.D. Ohio 1987)

19 (prospective buyer identified and prospective buyer's financing deemed likely); *In re Timber*

20 *Tracts, Inc.*, 70 B.R. 773, 777-778 (Bankr. D. Mont. 1987) (the debtor had a proven "track record"

21 of sales, and the plan included an alternative capital infusion provision).

22     Here, the Debtor provided absolutely no specifics.  The Debtor has no sale commitments.

23 The Debtor does not know who shall purchase the Property, when it shall be purchased, or for how

24 much it shall be purchased.  Moreover, the Debtor does not disclose when and how it shall

25 refinance Cathay's debt.  There is no evidentiary basis for the prospective sale or the refinancing.

26 More glaringly, the interest rate proposed in the Plan, 2% over the one year LIBOR rate (which is

27 approximately 0.76%), or 2.76%, is even lower than the Wall Street Journal Prime Rate, the index

28 on which interest for the Loan was originally based, or 3.25%.

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

1    Indeed, cognizant of how speculative its plan of reorganization is, the Debtor built an

2  initial extension period into the Plan of another two years in the event it cannot repay all creditors.

3  What is worse, the Debtor may also seek further extensions if there is a "legitimate business

4  purpose" for the extension. Plan §§ 13.2 – 13.3. In essence, the Debtor is simply trying to put off

5  a day of reckoning altogether. Given that the Debtor has never been able to sell the Property

6  before, could not find investors who can repay Cathay, and could not obtain refinancing in the past

7  two years after the Loan matured, it is improbable that the Debtor will be able to do so in the

8  future.

9        **C.    THE PLAN DOES NOT COMPLY WITH THE APPLICABLE**

10             **PROVISIONS OF TITLE 11 AS REQUIRED BY 11 U.S.C. § 1129(a)(1)**

11    A plan of reorganization must not comply with all applicable provisions of the Bankruptcy

12  Code. 11 U.S.C. § 1129(a)(1). The Debtor maintains Cathay and all other lienholders are

13  oversecured. Cathay asserts it is undersecured. If Cathay is oversecured, then it is entitled to the

14  payment of all post-confirmation interest, all pre-confirmation interest, and all fees and costs. *See*

15  11 U.S.C. § 506(b). Instead of strictly adhering to section 506(b), the Plan attempts to curtail

16  Cathay's claim by imposing a claim dispute mechanism, which has no basis in the claim resolution

17  process enshrined by the Bankruptcy Code. *See* Plan §§ 6.4.1 – 6.4.2. If the Debtor takes issue

18  with the amount of Cathay's claim, it can formally object to Cathay's claim pursuant to the

19  procedures established by section 502 of the Bankruptcy Code. The Plan's abrogation of Cathay's

20  claim adjudication rights under section 502 expressly violates section 502.

21    The Plan also seeks to turn the Bankruptcy Code's voting scheme on its head. Claimants

22  who do not vote to accept or reject a plan of reorganization are treated as not having voted. *See* 11

23  U.S.C. § 1126(c); Fed. R. Bankr. P. Rule 3018(c); *In re M. Long Arabians,* 103 B.R. 211, 216

24  (B.A.P. 9th Cir. 1989) ("Since Bell Road, the only Class C claim holder, did not vote affirmatively

25  to accept the debtor's Plan . . . Class C could not have voted to accept the Plan."). Instead of

26  following the Bankruptcy Code, the Plan seeks to treat claimants who have not voted for or

27  against the Plan as having voted to accept the Plan. Plan § 14.5. Thus, the Plan does not conform

28  with all applicable provisions of the Bankruptcy Code dealing with how votes are counted as well

854908.1 | 023000-0724                                      8

1 as how disputes with Cathay's claim should be resolved.[2]

2 **D.   THE PLAN IS UNFAIR AND INEQUITABLE IN VIOLATION OF 11 U.S.C.**

3 **§ 1129(b)(2)(A)**

4 **1.   The Plan is Unfair and Inequitable Because It Negatively Amortizes the**

5 **Bank's Secured Claim**

6 The Debtor intends to repay Cathay over 36 months.  In the event of an election by the

7 Debtor, the Debtor can extend the time to repay Cathay for an additional 24 months.  The Debtor

8 may also seek an unlimited amount of further extensions.  During this period, Cathay is only

9 entitled to interest payments at the rate of 2% plus the one year LIBOR rate.  It is unclear when

10 exactly the Bank shall be paid *some* principal or even how much within the next three to five years

11 or more.  Perhaps some principal payments will be made in month seven or perhaps, and more

12 likely, payments will be made in month sixty-five.  Furthermore, as demonstrated by the evidence

13 submitted by Cathay, the Plan's proposed interest rate is simply too low.  It is less than the prime

14 rate in the United States.  Consequently, interest above the rate proposed by the Debtor will

15 continue to accrue during the term of the Plan.

16 Negative amortization refers to "a provision wherein part or all of the interest on a secured

17 claim is not paid currently but instead is deferred and allowed to accrue," with the accrued interest

18

19 [2] Similarly, the Plan also attempts to upend section 1141(b) altogether.  Though the Plan

20 revests all property of the estate in the Reorganized Debtor (Plan § 15.1), the Plan seeks to keep
the Debtor's access to the Court open for the Court to approve the Debtor's sale of the Property or

21 obtain financing or equity contributions that will not pay all claims in full.  Plan §§ 11.4.2 and
11.5.3.  In essence, the Debtor states on the one hand that all property of the estate will revest in

22 the Reorganized Debtor upon confirmation, but on the other hand, the Debtor still wants to use
sections 363 and 364 of the Bankruptcy Code for the Court to approve any sales of property of the

23 estate or to obtain credit.  The Debtor cannot have it both ways because as a matter of statutory

24 construction sections 363 and 364 only apply pre-confirmation while the estate is open, before all
property of the estate revests. *See In re Golf, L.L.C.*, 322 B.R. 874, 877 (Bankr. D. Neb. 2004).

25 Furthermore, if the Plan will keep the Debtor's access to the Court open for the Debtor to seek
court approval of a post-confirmation sale, financing, or equity contribution, the Plan should

26 provide the standard upon which the Court may approve such transactions.  Otherwise, the Debtor

27 may seek approval of transactions post-confirmation with little oversight that will leave Cathay's
claim inadequately protected.

28

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA  90048-4920
(323) 852-1000

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

1 added to the principal and paid when income is higher. The extent of negative amortization

2 depends upon the difference between the "accrual rate," or the overall rate of interest to be paid on

3 a claim, and the "pay rate," or the rate of interest to be paid on a monthly basis. *Great Western*

4 *Bank v. Sierra Woods Group*, 953 F.2d 1174, 1176 (9th Cir. 1992) (internal citations omitted).

5       Bankruptcy courts strongly disfavor negative amortization plans because they "tend to be

6 fraught with pitfalls that unfairly endanger creditors." *See id.* at 1177. Moreover, negative

7 amortization plans can be "extremely unfair and inequitable" to secured creditors because they

8 will not recover the present value of their claims, as required by the Bankruptcy Code, should the

9 plan fail. *See In re Consolidated Props. Limited P'ship*, 170 B.R. 93, 99 (Bankr. D. Md. 1994);

10 *see also In re Memphis*, 99 B.R. 385, 388 (Bankr. M.D. Tenn. 1989). For these reasons, negative

11 amortization plans are carefully scrutinized and rarely confirmed. *See In re Oaks Partners, Ltd.*,

12 141 B.R. 453, 457 (Bankr. N.D. Ga. 1992); *In re Consolidated Props. Ltd. P'ship*, 170 B.R. 93, 99

13 (Bankr. D. Md. 1994); *In re Howard*, 212 B.R. 864, 877 (Bankr. E.D. Tenn. 1997); *In re 641*

14 *Assocs., Ltd.*, 140 B.R. 619, 630 (Bankr. E.D. Pa. 1992); *In re Wynnefield Manor Assocs., L.P.*,

15 163 B.R. 53, 59 (Bankr. E.D. Pa. 1993).

16       The fairness of negative amortization plans is determined on a case-by-case basis. *See*

17 *Great Western Bank*, 953 F.2d at 1177-1178. In making this determination, a bankruptcy court

18 may consider the following factors:

19     1.    Does the plan offer a market rate of interest and present value of the deferred
payments;

20

21     2.    Is the amount and length of the proposed deferral reasonable;

22     3.    Is the ratio of debt to value satisfactory throughout the plan;

23     4.    Are the debtor's financial projections reasonable and sufficiently proven, or is the
plan feasible;

24     5.    What is the nature of the collateral, and is the value of the collateral appreciating,
depreciating, or stable;

25

26     6.    Are the risks unduly shifted to the creditor;

27     7.    Are the risks borne by one secured creditor or class of secured creditors;

28     8.    Does the plan preclude the secured creditor's foreclosure;

1    9.    Did the original loan terms provide for negative amortization; and

2    10.    Are there adequate safeguards to protect the secured creditor against plan failure.

3  *Id.* at 1178 (quoting *In re Apple Tree Partners, L.P.*, 131 B.R. 380, 398 (Bankr. W.D. Tenn.

4  1991)).  However, "these factors should not be considered alone and may have different weights in

5  different contexts." *In re 641 Assocs., Ltd.*, 140 B.R. 619, 631 (Bankr. E.D. Pa. 1992); *see also*

6  *Great Western Bank*, 953 F.2d at 1178.

7    Here, the majority of the relevant factors demonstrate that the Plan cannot be confirmed.

8  First, the Plan does not propose paying Cathay a market rate of interest.  As a result, any interest

9  rate Cathay is paid shall have to be increased to adequately compensate for the increased risk of

10  nonpayment.

11    Second, the length and amount of the proposed deferral is not reasonable.  A three to five

12  year *or more* deferral is unreasonable given the facts of this case, that the loan originally had a two

13  year maturity, and because the amount of unpaid interest will be significant.  At the present non-

14  default contract interest rate of 6.5%, interest is accruing on Cathay's claim at a faster rate than the

15  2.76% proposed by the Debtor.  Deferred interest of 3.74% on a claim of $22.3 million over three

16  years is unreasonable.  *See, e.g., In re Oaks Partners, Ltd.*, 141 B.R. 453 (Bankr. N.D. Ga. 1992)

17  (holding that deferred interest in the amount of $301,946 was unreasonable).

18    Third, there is absolutely no equity in the Property.  Even if any equity were created post-

19  confirmation, it would be eroded by the accrual of interest on Cathay's claim.

20    Fourth, the Plan is not feasible.  As discussed above, there is no reason to believe the

21  Debtor can sell the Property at a sufficient price to repay all creditors, obtain financing, or find

22  new investors in the timetable provided.  This indicates why the Debtor seeks the absolute right to

23  extend the Loan ad infinitum.  The Debtor has been unable to do so to date and there is no

24  evidence that the financing, a sale, or investment equity will be easier to accomplish in the future.

25    Fifth, the original terms of the Loan by Cathay did not provide for negative amortization.

26  Rather, the full amount of interest was payable each month beginning shortly after the funding of

27  the Loan.

28    Sixth, the Plan does not provide adequate safeguards to protect Cathay against plan failure.

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

854908.1 | 023000-0724

11

The Plan does not provide any remedy, much less the revocation of the confirmation order, should the Debtor be unable to pay administrative claims by the effective date or obtain sale commitments or a refinancing. Instead, the Plan places even more burdens on Cathay, requiring Cathay to provide a notice of default to the Debtor and sixty days for the Debtor to cure the default before Cathay can proceed with its remedies under the Bankruptcy Code, much less its rights and remedies under applicable non-bankruptcy law. Plan §§ 17.1 – 17.2.

It is also unacceptable that after eight months in a "single asset real estate case," Cathay is no closer to full repayment or foreclosure. *See In re Calvanese*, 169 B.R. at 112, *see also In re Wynnefield*, 163 B.R. 53, 61 (Bankr. E.D. Pa. 1993) (rejecting a plan that contained nothing which protected the secured creditor in the event it failed). At a *minimum*, Cathay should be granted immediate relief from stay and permitted to foreclose without opposition should the Debtor fail. *See, e.g., In re Calvanese*, 169 B.R. at 112 (suggesting a deed in lieu of foreclosure or a friendly foreclosure).

Courts are in agreement that negative amortization plans should be carefully scrutinized and *rarely approved*. This "single asset real estate case" involving a debtor with little cash and a small source of income is hardly the exceptional case justifying negative amortization. The Debtor expects Cathay to wait for at least three years without any payment of principal and without any payment of interest at a market rate while it attempts to complete some visionary sale or refinancing which it has been unable to do to date and which is not reasonably likely to occur in the near future. Furthermore, the Plan fails to provide for the adequate safeguards should the Plan fail. Accordingly, the negative amortization proposed in the Plan is not fair and equitable.

## 2. The Plan is Unfair and Inequitable Because it Does Not Satisfy 11 U.S.C. § 1129(b)(2)(A)(i), (ii), or (iii).

### (a) Section 1129(b)(2)(A)(i) cannot be satisfied.

Section 1129(b)(2)(A)(i) provides:

> (II) each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property.

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

1    Section 1129(b)(2)(A)(i) requires a stream of payments equal to the present value of

2 Cathay's secured claim. The measure between full payment today and a stream of future payments

3 is interest. *See In re Arnold*, 806 F.2d 937, 940 (9th Cir. 1986). By virtue of section 506(a)(1),

4 Cathay's secured claim is equal to the entire value of the Property.

5    For purposes of section 1129(b)(2)(A)(i), the interest rate is that rate the market would

6 charge for a similar project. *See Till v. SCS Credit Corp.*, 124 S.Ct. 1951, 1959-1960 n.14 (2004).

7 In *Till,* the Supreme Court adopted a "formula approach" for determining the appropriate interest

8 rate in a Chapter 13 proceeding involving a truck. In a plurality opinion, the Court determined

9 that where there is no market for similar loans, courts should apply the prime rate and add a risk

10 adjustment. *Id.* at 1961-1962. *Till's* footnote 14 provides that, unlike in the chapter 13 context, in

11 the chapter 11 context where there is a market, it makes more sense "to ask what rate [the] market

12 would produce." Numerous courts have endorsed the "market approach" where an identifiable

13 market exists. *In re American Homepatient, Inc.*, 420 F3d 559, 568 (6th Cir. 2005); Gary W.

14 Marsch and Matthew M. Weiss, *Chapter 11 Interest Rates After Till*, 84 AM. BANKR. L.J., 209,

15 213 (2010) (noting an emerging consensus regarding *Till's* application and canvassing cases).

16    For commercial real estate, such as the Property here, there is a market for financing,

17 though it is less favorable than a few years ago. *See, generally,* Rifkind Decl. Real estate similar

18 to the Property are generally financed in tiers. The more favorable tiers require a lower rate of

19 interest, while the riskier tranches demand a higher interest rate. *See In re Boulders on the River,*

20 *Inc.*, 164 B.R. 99, 105 (B.A.P. 9th Cir. 1994); *In re North Valley Mall, LLC*, 432 B.R. 825, 830-

21 836 (Bankr. C.D. Cal. 2010). Blending the various interest rates demanded by each tier

22 determines a general rate for a loan equal to Cathay's secured claim. That rate would be 12.64%

23 in this case. Even using a formula rate as in *Till* leads to a rate 10.56%, far in excess of the 2.76%

24 proposed by the Plan.

25    The Debtor certainly could not meet these interest payments. Nor could the Debtor repay

26 any principal. Hence, the Debtor cannot pay Cathay "deferred cash payments totaling the allowed

27

28

amount" of its claim and therefore cannot cramdown a plan over Cathay's objection under section 1129(b)(2)(A)(i).[3]

### (b)    Section 1129(b)(2)(A)(ii) cannot be satisfied.

Nor does the Plan satisfy section 1129(b)(2)(A)(ii).  Section 1129(b)(2)(A)(ii) reads:

> for the sale, <u>subject to section 363(k) of this title</u>, of any property that is subject to the liens securing such claims, free and clear of such liens, with such liens to attach to the proceeds of such sale, and the treatment of such liens on proceeds under clause (i) or (iii) of this subparagraph…

(emphasis added.)

The Plan contemplates a potential sale of the Property, but does not provide for Cathay's ability to credit bid at such a sale.  The Plan therefore appears to deprive Cathay of its credit bid rights pursuant to section 363(k).  Any plan which involves the sale of property subject to liens to be sold free and clear of liens, but which does not preserve credit bid rights is unconfirmable as a matter of law. *See, e.g., H & M Parmely Farms v. Farmers Home Admin.,* 127 B.R. 644 (D.S.D. 1990); *In re Monarch Beach Venture, Ltd.,* 166 B.R. 428, 433 (C.D. Cal. 1993) ("Thus, at least in this Circuit, the right to credit bid may not be taken from the creditor."); *In re California Hancock, Inc.*, 88 B.R. 226, 229-231 (B.A.P. 9th Cir. 1988) (affirming bankruptcy court's decision to deny confirmation of the debtor's plan where it ruled that section 363(k) applied to property being sold through a plan of reorganization); *see also In re Realty Invest., Ltd. V,* 72 B.R. 143, 146 (Bankr. C.D. Cal. 1987).

Furthermore, section 1129(b)(2)(A)(ii) deals with sales under a plan of reorganization. The court in *In re Georgetown Park Apartments*, 103 B.R. 248 (Bankr. S.D. Cal. 1989), addressed the issue of what qualified as a "sale" under a plan and concluded that a plan which provided no identifiable buyer at a time substantially contemporaneous with confirmation was unconfirmable. "The fact that the debtor has identified a date, the price and the terms of a sale in the absence of an identifiable buyer does not make the proposed sale any less speculative…[m]erely identifying the

---

[3] The Bank objects to any attempt by the Debtor to modify this provision of the Plan at this stage as either being in bad faith or by a means forbidden by law. *See* 11 U.S.C. § 1129(a)(3).

FRANZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA  90048-4920
(323) 852-1000

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

1  date, price and terms is certainly no assurance that a ready, willing and able purchaser will be

2  found at the price and terms when the debtor conducts its sale…" *Id.*

3       Hence, for a sale to qualify for treatment pursuant to section 1129(b)(2)(A)(ii), the sale

4  must occur substantially contemporaneous with the plan's confirmation. *See also In re Western*

5  *Real Estate Fund, Inc.*, 75 B.R. 580, 589 (Bankr. W.D. Okla. 1987); *In re Swiftco, Inc.*, 1988

6  Bankr. LEXIS 2251, *43 (Bankr. S.D. Tex. 1988) ("Nevertheless, for a debtor to propose a plan

7  providing for a possible future sale of property without specified terms is wholly fruitless under

8  § 1129(b)(2)(A)(ii). For a court to approve a sale in advance without knowing its date and terms

9  contradicts the protections of the Code.") Thus, the Plan not only fails section 1129(b)(2)(A)(ii)

10  because it does not provide for Cathay's credit bid rights, it also fails section 1129(b)(2)(A)(ii)

11  because the Debtor's proposed sale under the Plan is years away and remains speculative, at best.

12       **(c)**     **Section 1129(b)(2)(A)(iii) cannot be satisfied.**

13       Section 1129(b)(2)(A)(iii) requires that the holders of secured claims realize the

14  "indubitable equivalent" of their claims. The legislative history of 11 U.S.C. § 1129 shows Judge

15  Learned Hand coined the phrase "indubitable equivalent" in *In re Murel Holding Corp.*, 75 F.2d

16  941 (2d Cir. 1935) (hereafter "*Murel*"). *See In re Arnold & Baker Farms*, 85 F.3d 1415, 1422 (9th

17  Cir. 1996) (hereafter "*A&B Farms*").

18       In *Murel*, the joint bankrupts[4] owned an apartment building. 75 F.2d at 941. A first

19  mortgage of $405,000 and taxes of over $100,000 encumbered the building which had a value of

20  $540,000. *Id.* at 941-943 ("The liens of the taxes and the first mortgage now are nearly

21  $500,000…"). An affiliate owned all of the stock in the bankrupts and a junior lien on the

22  building. *Id.* at 941. The affiliate proposed advancing funds with priority over the first mortgagee

23  to improve the building, making certain apartments more "leaseable." After paying expenses,

24  interest on the first lien and past due taxes, the principal on the first lien would be paid at the end

25  of ten years. The bankrupts expected the first lien holder to overlook the amortization of the

---

27      [4] The former Bankruptcy Act did not use the term "debtor." *See* §1(4) of the former

Bankruptcy Act, 11 U.S.C. § 1 (1976) (repealed 1979).

1 principal payments and extend the loan's maturity date. *Id.* at 942.

2 Out of several options, similar to section 1129(b)(2)(A)(i) and (ii), the then Bankruptcy

3 Act provided the first lien could be sold free and clear with the lien to attach to the proceeds or the

4 value of the lien could be appraised and paid. The bankrupts chose a third option: to adequately

5 protect the lien holder. In defining adequate protection, the court remarked:

6 It is plain that "adequate protection" must be completely compensatory; and that
7 payment ten years hence is not generally the equivalent of payment now. Interest is
indeed the common measure of the difference, but a creditor who fears the safety of
his principal will scarcely be content with that; he wishes to get his money or at
8 least the property. We see no reason to suppose that the statute was intended to
deprive him of that in the interest of junior holders, unless by a substitute of the
9 most indubitable equivalence.

10 *Id.* (emphasis added.)

11 Sixty-one years later, the Ninth Circuit Court of Appeals expounded on

12 Judge Hand's "indubitable equivalence" phrase in the context of section 1129(b)(2)(A)(iii). The

13 appellate court explained that to constitute the indubitable equivalent, the property distributed

14 under a plan of reorganization must ensure the "safety of or prevent jeopardy to the principal" of

15 the debt and any "substitute collateral [may] not increase the creditor's risk exposure." *A&B*

16 *Farms*, *supra*, 85 F.3d at 1422. The appellate court wholly incorporated the concerns of the lower

17 court, the Ninth Circuit Bankruptcy Appellate Panel which stated:

18 The Supreme Court analyzed the meaning of "indubitable equivalence" finding that
"*Murel* used the words 'indubitable equivalence' with specific reference not to
19 interest (which was assured), but to the *jeopardized principal of the loan.*" *United*
*Sav. Ass'n v. Timbers of Inwood Forest, Ltd.*, 484 U.S. 365, 378…Similarly, the
20 Ninth Circuit interpreted "indubitable equivalence" in *Murel* to mean a substitute
that "must both compensate for present value and *insure the safety of the*
21 *principal.*" *In re American Mariner Indus., Inc.*, 734 F.2d 426, 433-34 (9th Cir.
1984), *abrogated on other grounds, United Sav. Ass'n v. Timbers of Inwood*
22 *Forest*…

23 *In re Arnold & Baker Farms*, 177 B.R. 648, 661 (B.A.P. 9th Cir. 1994) (no emphasis added.)

24 In this instance, there is no guarantee that the Debtor can repay Cathay its principal.

25 Cathay's own evaluation of the Property shows that the Property cannot presently pay Cathay's

26 principal. Cathay's evidence submitted in connection with these objections also shows that the

27 Property cannot repay Cathay's principal over time. Indeed, the very structure of the Plan admits

28 that Cathay's principal is at risk: it allows for the Debtor to perpetually continue the date to pay

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

1  Cathay's principal back.

2  Unlike *Murel,* even the most basic measure of protection for principal is not being

3  provided – interest at an adequate rate. And the principal is due now because the Loan already

4  matured of its own accord. Like, the bankrupts in *Murel* the Debtor is attempting to extend the

5  term of the Cathay's loan without amortizing the repayment. In light of the prior default, Cathay's

6  principal bears enormous risk. The Plan does not satisfy any of the standards set forth by the

7  Ninth Circuit in *A&B Farms* with regards to indubitable equivalence. "'Indubitable' means 'too

8  evident to be doubted.'" *A&B Farms*, *supra,* at 1421. The Debtor's Plan is so fraught with risk that

9  it leaves room for nothing but doubt. Thus, the Plan does not satisfy section 1129(b)(2)(A)(iii).

10  **E.     THE PLAN IS UNFAIR AND INEQUITABLE IN VIOLATION OF 11 U.S.C.**

11  **§ 1129(b)(2)(B)**

12  The Plan also violates section 1129(b)(2)(B)(ii). As expressed above, Cathay believes it is

13  undersecured. Cathay not only holds its claim that is secured by the value of the Property, but it

14  also holds an unsecured claim for the amount of its claim that exceeds the value of the Property.

15  *See* 11 U.S.C. § 506(a)(1). If Cathay's evaluation of the Property is correct and if the class of

16  general, unsecured claims votes against the Plan, the Debtor still needs to satisfy section

17  1129(b)(2)(B)(ii) with respect to Cathay's unsecured claim.

18  Section 1129(b)(2)(B)(ii) states:

19  (B) With respect to a class of unsecured claims—

20  …

21  (ii) the holder of any claim or interest that is junior to the claims of such class will
     not receive or retain under the plan on account of such junior claim or interest any
22  property, except that in a case in which the debtor is an individual…

23  The United States Supreme Court defined "property" in section 1129(b)(2)(B)(ii) to include equity

24  interests. "Even where debts far exceed the current value of assets, a debtor who retains his equity

25  interest in the enterprise retains "property"…a retained equity interest is a property interest to

26  'which the creditors [are] entitled…before the stockholders [can] retain it for any purpose

27  whatever.'" *Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 207-208 (1988) (quoting

28  *Northern Pac. R. Co. v. Boyd*, 228 U.S. 482, 508 (1913)).

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

1       Here, the Debtor proposes paying the unsecured claims in full without interest at the end

2  of three years or more. Plan §§ 9.1 – 9.2. Yet, the equity interest holders shall retain their

3  interests in the Debtor. *Id.* at §§ 10.1 – 10.3. In other words, the Debtor's members will retain

4  property. In exchange for retaining this "property," the members will waive all fees and

5  commissions for management services and *to the extent all unsecured claims are not paid in full*,

6  they will pay a total of $50,000. The additional capital shall be paid after a noticed hearing is held

7  before this Court, but it is never disclosed when such a hearing may take place. It could transpire

8  six months after the effective date or three years after the effective date. *See id* at §§ 10.1 – 10.3.

9       To avoid violating section 1129(b)(2)(B)(ii), the Plan attempts to use what is colloquially

10  referred to as the "new value exception." The Supreme Court has repeatedly evaded answering

11  whether the supposed "new value exception" survived the Bankruptcy Act's codification. *See*

12  *Bank of America Nat'l Trust and Sav. Ass'n v. 203 North LaSalle Street P'ship*, 526 U.S. 434, 443

13  (1999); *U.S. Bancorp Mortg. Co. v. Bonner Mall P'ship*, 513 U.S. 18, 20 n.1 (1994); *Norwest*

14  *Bank Worthington v. Ahlers*, 485 U.S. 197, 203 n.3 (1988). For the sake of argument, we shall

15  assume the "new value exception" survived.

16       Generally, the "new value exception" is at play when the "old equity" in the debtor

17  attempts to participate in the reorganization by contributing new consideration. The old equity

18  may take the form of stockholders in a corporation, partners in a partnership, and fee simple

19  owners. *Case v. Los Angeles Lumber Prods. Co.*, 308 U.S. 106 (1939) (dealing with shareholders

20  in a corporation); *203 North LaSalle*, 526 U.S. at 438 (involving partners in a limited partnership);

21  *Ahlers*, 485 U.S. at 199 (noting the debtors owned the farm subject to the debts being

22  reorganized).

23       The Plan does not meet the "new value" exception because no "new value" is being

24  contributed. In order to constitute "new value" the consideration must be "money or money's

25  worth." *Ahlers*, 485 U.S. at 203. In addition, the contribution must be: (1) reasonably equivalent

26  in value to the continued participation of the old equity; (2) necessary to the reorganization; and

27  (3) a fresh contribution to the reorganization. *Case,* 308 U.S. at 121-122; *In re Bonner Mall*

28  *P'ship*, 2 F.3d 899, 908 (9th Cir. 1992).

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA, 90048-4920
(323) 852-1000

1    The proposed contribution of the Debtor's members does not qualify as necessary to the

2  reorganization. A future contribution that takes place after the effective date of the plan does not

3  qualify as new value. *In re Yasparro*, 100 B.R. 91, 97 (Bankr. M.D. Fla. 1989). A present

4  contribution is imperative because if the reorganization fails, it needs to be liquidated and

5  distributed to creditors. *In re Stegall*, 85 B.R. 510, 515 (C.D. Ill. 1987), *aff'd*, 865 F.2d 140 (7th

6  Cir. 1989). In this instance, the Plan is vague as to when the members will contribute $50,000.

7  The contribution could take place well after the effective date.

8    The proposed contribution does not satisfy the reasonable equivalence element either. A

9  contribution is not the reasonable equivalent of the interest retained where the asset's value,

10  irrespective of the debt charged against the asset, dwarfs the value of the contribution. *See, e.g., In

11  re Miami Center Assocs., Ltd.*, 144 B.R. 937, 942 (Bankr. S.D. Fla. 1992). Given that the Property

12  is worth at least $18 million, a contribution of $50,000, or 0.2778% of the Property's value, is

13  woefully insufficient. For the foregoing reasons, the Plan violates section 1129(b)(2)(B)(ii) and

14  no new value is being provided.

15    **F.    THE PLAN UNFAIRLY DISCRIMINATES AGAINST CATHAY'S**

16         **UNSECURED CLAIMS**

17    Cathay asserts it is undersecured. If Cathay is correct, then all liens junior to Cathay's lien

18  are unsecured. These claims should be treated under Class D of the Plan, the class which provides

19  treatment for all general, unsecured claims. The Plan separately classifies these claims in Classes

20  C-3, C-4, and C-5, entitling them to payment in full, however. The Plan provides that general,

21  unsecured claims, which are treated in Class D, *may not be paid in full*, and in the event they are

22  not paid in full, the Debtor's members will contribute $50,000.

23    A plan of reorganization cannot discriminate unfairly between classes of claims absent a

24  basis for treating similar claims differently. *In re Johnston*, 21 F.3d 323, 327-328 (9th Cir. 1994);

25  *In re Monarch Beach Venture, Ltd.*, 166 B.R. 428, 437 (C.D. Cal. 1993) ("bankruptcy court must

26  evaluate the interest structure of the plan, and make findings and conclusions whether and in what

27  manner there is a reasonable basis for any discrimination, and the importance to the plan of such

28  discrimination"). Here, there is no basis for separately classifying and providing better treatment

854908.1 | 023000-0724                                    19

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

1  to the junior lienholders. To the extent Cathay is undersecured, these claims should be treated like

2  general, unsecured claims, and be given no better treatment than Cathay's unsecured claim.

3    **G.  BECAUSE THE PLAN IS NOT CONFIRMABLE AS A MATTER OF LAW,**

4      **THE COURT MUST GRANT RELIEF FROM THE AUTOMATIC STAY**

5      **PURSUANT TO 11 U.S.C. § 362(d)(3)**

6    Cathay's treatment under the Plan would be bad enough if this was a normal chapter 11,

7  but what makes this matter especially egregious is that this case has been deemed a single asset

8  real estate case. Congress enacted section 362(d)(3) to assist secured creditors – to give secured

9  creditors *expedited relief* when the debtor fails to file a confirmable plan or make payments. *See*

10 *In re LDN Corp.*, 191 B.R. 320, 327 (Bankr. E.D. Va. 1996). Section 362(d)(3) is unambiguous

11 and strict compliance with its provisions are required. *See id.* (cited with approval in *In re CBJ*

12 *Development, Inc.*, 202 B.R. 467, 470 (B.A.P. 9th Cir. 1996)); *see also In re Heather Apartments*

13 *Ltd. P'ship*, 366 B.R. 45, 51 (Bankr. D. Minn. 2007) (stating that relief from stay is presumption,

14 unless the debtor does "very specific things," *i.e.*, pays the creditor or files a confirmable plan).

15   Clearly for the reasons discussed above, the Court cannot confirm the Debtor's Plan.

16 Because the Plan is patently unconfirmable it certainly does not have a "reasonable possibility of

17 being confirmed in a reasonable time" as required by section 362(d)(3). Thus, the question is,

18 whether this Court will give the Debtor a second chance to propose a reasonable plan that even has

19 the potential to be confirmed and satisfy section 362(d)(3) months after the specified deadline.

20 The answer must be "no."

21 / / /

22 / / /

23

24

25

26

27

28

## V.   CONCLUSION

For all of the reasons above, the Court should not confirm the Plan and should grant the Cathay relief from the automatic stay.


DATED: June 17, 2011                    Respectfully submitted,

                                        FRANDZEL ROBINS BLOOM & CSATO, L.C.
                                        MICHAEL GERARD FLETCHER
                                        BERNARD R. GIVEN II
                                        MICHAEL J. GOMEZ


                                        By:   /s/ Michael J. Gomez
                                              MICHAEL J. GOMEZ
                                              Attorneys for Cathay Bank

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

854908.1 | 023000-0724