1  LAWRENCE A. JACOBSON, SBN 057393
   SEAN M. JACOBSON, SBN 227241
2  COHEN AND JACOBSON, LLP
   900 Veterans Boulevard, Suite 600
3  Redwood City, California 94063
   Telephone: (650) 261-6280
4  Facsimile: (650) 368-6221

5  Attorneys for Debtor
   China Village, LLC

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

In re:                                    Case No. 10-60373 ASW

CHINA VILLAGE, LLC,
                                          <u>Status Conference</u>
         Debtor.
                                          Date:  June 28, 2011
                                          Time:  2:00 p.m.
                                          Place: Hon. Arthur S. Weissbrodt

                                          <u>Confirmation Hearing</u>

                                          Date:  TBD
                                          Time:  TBD
                                          Place: Hon. Arthur S. Weissbrodt

_____

**DEBTOR'S REPLY TO CATHAY BANK'S OPPOSITION
AND OBJECTIONS TO CONFIRMATION**

# TABLE OF CONTENTS

| | | |
|---|---|---|
| I. | INTRODUCTION | 2 |
| | A. Background of Case and Status of Confirmation Proceedings | 2 |
| | B. Summary of Plan | 2 |
| | C. Status of Case | 3 |
| | D. Voting on the Plan Has Closed and All Classes Other Than Cathay Bank Have Voted Unanimously to Approve the Plan | 3 |
| II. | SUMMARY OF RESPONSE | 4 |
| III. | THE PLAN IS UNDOUBTABLY FEASIBLE | 4 |
| IV. | THE PLAN COMPLIES WITH THE PROVISIONS OF 11 U.S.C. § 1129(a)(1) | 7 |
| V. | THE PLAN IS FAIR, EQUITABLE, AND FULLY COMPLIANT WITH 11 U.S.C. § 1129(b)(2) | 9 |
| | A. The Plan is Not a Negative Amortization Plan | 9 |
| | B. The Proposed Interest Rate is Appropriate | 10 |
| | C. The Terms Regarding Sales Procedures Are Appropriate | 13 |
| | D. The Bank is Receiving the Present Value of Its Claim | 13 |
| | E. The New Value Provided for in the Plan Complies With Applicable Bankruptcy Law | 14 |
| | F. The Plan Does Not Discriminate Against Any Unsecured Claim of Cathay Bank, as Cathay Bank is Fully Secured | 15 |
| VI. | CONCLUSION | 15 |

# TABLE OF AUTHORITIES

## Cases

*Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. Lasalle St. P'ship* (1999) 526 U.S. 434. . . . . . . . . 15

*In re Brotby* (9th Cir BAP, 2003) 303 B.R. 177. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*In re Caviata Attached Homes, LLC* (BC D NV 2010) 2010 Bankr. LEXIS 4270 . . . . . . . 5, 6, 11-13

*In re Industry West Commerce Ctr., LLC* (9th Cir. B.A.P., May 24, 2011) 2011 Bankr. LEXIS 2090
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 13

*In re Mendoza* (BC ND Cal. 2010) 2010 Bankr. LEXIS 1308. . . . . . . . . . . . . . . . . . . . . . . . 11, 13

*In re Phila. Newspapers, LLC* (3rd Cir. 2010) 599 F.3d 298. . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*In re Pizza of Hawaii, Inc.* (9th Cir. 1985) 761 F2d 1352. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*In re Wallace* (BC ED Wash. 2008) 2008 Bankr. LEXIS 864.. . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*State Street Bank v. Elmwood, Inc. (In re Elmwood, Inc.)* (D NV 1995) 182 B.R. 845. . . . . . . . . 14

*Till v. SCS Credit Corp.* (2004) 541 U.S. 465. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 12

*United Sav. Asso v. Timbers of Inwood Forest Assocs.* (1988) 484 U.S. 365. . . . . . . . . . . . . . . . 13

## Statutes

11 U.S.C. § 1129(a)(1).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

11 U.S.C. § 1129(a)(11).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

11 U.S.C. § 1129(b)(2)(A)(i)(II). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Debtor presents the following Reply to Cathay Bank's Opposition and Objections to Confirmation[1]:

## I. INTRODUCTION

### A. Background of Case and Status of Confirmation Proceedings

This is a single asset real estate case, and as such Debtor timely filed its Plan and Disclosure Statement on January 2, 2011. The Disclosure Statement Hearing took place on February 18, 2011, and the Court approved the Disclosure Statement over objections by Cathay Bank, subject to certain agreed upon revisions. Debtor prepared the Modified Plan and Disclosure Statement, and the Court entered its Order Approving Disclosure Statement on March 29, 2011, with that Order setting pertinent deadlines related to confirmation.

The Confirmation Hearing was initially set for May 13, 2011. Pursuant to a stipulation among Debtor, secured creditor Cathay Bank, and secured creditor Fremont Investment Property Company, LLC ("Fremont"), the confirmation hearing was continued in order to allow the parties time to discuss settlement of certain objections that Cathay expressed to confirmation. The current status conference set for June 28, 2011, was scheduled as a date upon which the Court would set deadlines pertaining to confirmation in the event that a settlement was not reached in the interim. The parties have agreed to participate in a BDRP session in order to evaluate settlement possibilities, and Michael Isaacs, Esq., has been appointed as the Resolution Advocate. In the event that a settlement is not reached, Debtor is prepared to promptly proceed to confirmation, and believes that the Plan at issue is confirmable over the objections raised by Cathay Bank.

### B. Summary of Plan

The Plan is a 100% payment plan which contemplates ultimate payment of creditors through the sale or refinance of the Property. The Property has a minimum value of $46,000,000 pursuant to an appraisal obtained in November, 2010, with that value far exceeding all claims in this bankruptcy

---

[1] This brief responds to the objections raised in Cathay Bank's Objection to Confirmation only. Debtor will file its Confirmation Brief upon the schedule ordered by the Court at the Status Conference on June 28, 2011.

1

case. During the term of the Plan the Debtor will make monthly interest payments to Cathay Bank from (a) rental income; and (b) from a further advance which junior lien holder Redwood Mortgage has agreed to make in connection with the Plan.

Thus, all claims will be paid in full, and Cathay Bank will receive interest payments for the duration of the term of the plan, with the principal amount paid by the end of the term of the plan (or earlier if the sale or refinance occur prior to the end of the term of the plan). While predictably Cathay Bank argues that it "is entitled to more," the reality is that the bank will be paid 100% of its claim, with interest, pursuant to a Plan that has $1,000,000 set aside to assure that interest payments to the bank are made as required. Thus, the bank is exposed to virtually no risk whatsoever; holds a lien in first position that is over-secured by an incredible equity cushion in excess of $20,000,000; will receive interest payments for the duration of the Plan; and will be paid its full claim.

### C. Status of Case

Debtor is administratively compliant, and this has been a successful Chapter 11 case to date. Debtor has successfully opposed Cathay Bank's Motion for Relief From Stay, and the Court denied Cathay Bank's Motion to Excuse Compliance with 11 U.S.C. § 543. Thus, Debtor has operated as Debtor in Possession and as of May 31, 2011 Debtor's cash balances are approximately $709,899. Debtor has also been working to obtain bids related to improvement of the Property, and anticipates performing roof repairs in the near future.

### D. Voting on the Plan Has Closed and All Classes Other Than Cathay Bank Have Voted Unanimously to Approve the Plan

In compliance with the Order Approving Disclosure Statement, Debtor served the requisite plan documents on all creditors. Voting closed on May 6, 2011, and the deadline for filing objections to confirmation expired on June 17, 2011 (as extended by the stipulation to continue the Confirmation Hearing). With the exception of Cathay Bank, the secured creditor in first position (which is over-secured in an amount of approximately $20,000,000), all classes of classes of creditors submitting votes unanimously approved the proposed Plan. Likewise, the deadline for

2

Case: 10-60373    Doc# 135    Filed: 06/22/11    Entered: 06/22/11 17:42:21    Page 5 of 17

filing objections to confirmation has passed, and Cathay Bank is the only party that has filed an objection to confirmation.

**II.     SUMMARY OF RESPONSE**

Debtor submits that the Plan proposed complies fully with all requirements for confirmation, and should be confirmed as proposed.  Cathay Bank has raised only limited objections to confirmation to which Debtor will respond in this brief (with the full confirmation brief to be submitted as directed by the Court).  In fact, several of the arguments in the Objection to Confirmation were raised and dealt with at the Disclosure Statement Hearing, and the Opposition (as with others submitted by the bank in this case) appears to be a cut and paste from a template of some kind given that several of the citations are wholly inapposite to this case.

In sum, Debtor responds that (1) Cathay Bank is significantly over-secured, having filed a Proof of Claim in the amount of $23,300,000 which is secured by a property valued at $46,000,000; (2) the Plan provides for full payment of the bank's claim no later than the end of the term of the Plan, and also provides for interim interest payments to the bank; (3) the bank's claim is therefore fully provided for by the Plan; (4) the Plan is undeniably feasible and provides treatment beyond that which an ordinary commercial lender would receive given that Fremont has agreed to provide funding in the amount of $1,000,000 for the initial three year term of the Plan, which funds will be used to make interest payments to the bank; and (5) the bank's effort to classify the Plan as a negative amortization plan is unavailing as the bank will be paid interest for the duration of the Plan.

**III.    THE PLAN IS UNDOUBTABLY FEASIBLE**

The bank's initial objection is that the Plan is not feasible, with the bank arguing that (1) the Plan does not provide "specifics" regarding the proposed sale and/or refinance, namely "who shall purchase the Property, when it shall be purchased, or for how much it shall be purchased"; (2) the proposed interest rate is not sufficient; (3) the Plan's inclusion of potential extensions of the term of the Plan is not permissible; and (4) plans providing for the sale of property through the plan are not permitted.

With respect to the first argument regarding the specifics of the sale, this issue was raised by Cathay Bank as an objection to the Disclosure Statement, and was overruled. While Debtor would like to be able to predict the name of the buyer, the date of sale, and the amount of the sale, unfortunately it cannot, and is not required to provide "firm commitments" for refinancing or the details regarding the potential future purchaser. (*In re Caviata Attached Homes, LLC* (BC D NV 2010) 2010 Bankr. LEXIS 4270 (permitting sale of property by end of 3 year term of the Plan without identified buyer, price, or other details)).

The bank includes a string cite of multiple cases which it represents stand for the proposition that courts "have routinely rejected" plans that provide for the sale or refinance of property unless there is an identified buyer or lender. (Objection 6:14-15). Review of these cases reveals that not a single one stands for the broad proposition asserted. Rather, the cases, in the order cited, actually discussed that: (1) a plan that does not provide for interest payments while attempting to sell the property was not appropriate (which is not the case here where the bank will receive interest for the duration of the Plan) (*In re Calvanese*); (2) plan confirmation denied where the plan relied on the sale or refinance of three properties, but two of the properties were foreclosed prior to confirmation and the Debtor provided no evidence of value as to the remaining property (*In re Haardt*); (3) refinancing sought was not feasible because the Debtor sought a new unidentified *unsecured* loan or new third party investment (not a refinance) and where there was no real property collateral (*In re Ralph C. Tyler, P.E., P.S., Inc.*; (4) plan not confirmed because the value did not support the refinance (where the value was estimated at less than $5,000,000 but the financing needed was $9,000,000 to $15,000,000)(*In re Walker*); (5) confirmation denied where, on the facts of the particular case, there was no evidence that the Debtor could sell the property or that the property value was sufficient to pay claims (*In re Hoffman*); and (6) a plan *was confirmed* with the court finding that the evidence showed that the financing was obtainable (*In re Stratford Assocs. Ltd. P'ship*).

Debtor submits that the bank's argument that Courts cannot approve plans that involve the

4

sale or refinancing of property, simply does not make any sense. Chapter 11 plans that provide for the use of the Debtor's assets, including real property, are routinely approved. These plans can include the sale, refinance, development or other use of the property in a manner which will result in payment of creditors. Under the bank's theory, confirmation of any Chapter 11 plan involving the use of property must be denied unless there is a pre-identified buyer. This is not the law.

A recent case with strikingly similar facts dispels the notion that confirmation must be denied absent a pre-identified buyer. (*In re Caviata Attached Homes, LLC* (BC D NV 2010) 2010 Bankr. LEXIS 4270). In *Caviata*, the court found that the plan which proposed to attempt the sell the property within three years represented an exercise of "sound business judgment," "provides the greatest opportunities to maximize the value of the Debtor's estate," that "there is a reasonable likelihood that the [plan] will achieve results consistent with the objectives and purposes of the Bankruptcy Code," and that the plan was thus confirmed.

The terms of the plan in *Caviata* are remarkably similar to the case at bench. In the *Caviata* case the Debtor was a real estate developer that owned an apartment complex, which property was encumbered by a lien in favor of the objecting secured creditor. The Plan provided that the Debtor would continue to manage and operate the property, use rental income to make interest payments to the secured creditor, and that within three years the Debtor would pay claims by either refinancing or selling the property. The Plan provided for no identified buyer, nor any identified financing, but did provide that the secured party retained its security interests. The Court confirmed the Plan, rejected the lender's proposed "arbitrary" interest rate, and imposed a post-confirmation interest rate of 4.75%. In confirming the plan, the court discussed that it was reasonably likely that the Debtor would locate a buyer within the three year term, and even if it did not, that there would be no prejudice to the creditor because the creditor would be receiving payments, and the value of the property was likely to increase (not decrease) such that there was "no unreasonable shift of burden" to the bank. Similarly, the present Plan, which contemplates the sale or refinance of the Property within the designated term, is authorized by the Bankruptcy Code. (*Id*; *see also In re Wallace* (BC

5

ED Wash. 2008) 2008 Bankr. LEXIS 864 (plan based upon selling property confirmed – without any specified buyer)).

Returning to the stated basis of the objection in this section, namely feasibility, the feasibility requirement of 11 U.S.C. § 1129(a)(11) requires that the plan proponent demonstrate that the reorganization is not likely to be followed by liquidation or the need to further reorganize. The feasibility requirement does not require a showing of assured success, but rather only that there is a reasonable prospect of success. (*In re Brotby* (9th Cir BAP, 2003) 303 B.R. 177, 191). The *Brotby* case specifically describes the feasibility requirement as follows:

> "To demonstrate that a plan is feasible, a debtor need only show a reasonable probability of success. The Code does not require the debtor to prove that success is inevitable, and a relatively low threshold of proof will satisfy §§ 1129(a)(11) so long as adequate evidence supports a finding of feasibility. [Internal citations omitted]."
> (*Id*.)

The feasibility requirement has been explained as a mechanism "to prevent confirmation of visionary schemes which promise creditors and equity security holders more under a proposed plan than the debtor can possibly attain after confirmation." (*In re Pizza of Hawaii, Inc*. (9th Cir. 1985) 761 F2d 1352, 1364).

Under the facts of this case, Debtor submits that the Plan is feasible given that the value of the Property, namely $46,000,000, exceeds the amount of claims in this case. Further, Debtors cash flow and the funding from Fremont provide funds necessary to make interest payments to Cathay Bank prior to the sale or refinance of the Property.

## IV. THE PLAN COMPLIES WITH THE PROVISIONS OF 11 U.S.C. § 1129(a)(1)

The bank next argues that the Plan does not comply with 11 U.S.C. § 1129(a)(1). The only arguments presented on this basis are that (a) the bank believes that its "claim adjudication" rights are violated; (b) "the Plan also seeks to turn the Bankruptcy Code's voting scheme on its head"; and (c) that the Plan provides for retention of Bankruptcy Court jurisdiction for approval of the sale. All arguments reflect a misunderstanding or distortion of the terms of the Plan;

In its first argument the bank argues that the procedure in the Plan for quantifying the amount

of the bank's claim is not proper. Contrary to the implication in the Opposition, Debtor does not contend that Cathay is not entitled to interest and reasonable costs, however the amount of the claimed costs must be quantified as part of the confirmation process. The procedure is particularly necessary in the event that Cathay Bank will attempt to seek attorneys fees as part of its claimed costs given that the bank has taken a scorched earth strategy that has resulted in several unreasonable, and untenable, positions in this case. For example, Debtor will certainly oppose the award of any attorneys fees sought for the motion to excuse compliance, the motion for relief from stay (which not only was denied but the bank was sanctioned for having even filed the motion), and any other unreasonable costs. These are matters as to which the Court has the authority, and duty, to resolve, and therefore the provision in the Plan is appropriate. Indeed to the extent that the bank seeks attorneys fees and/or costs, it must seek court approval, and the Plan merely provides a mechanism and time frame for doing so. The bank cites to no authority that would support its argument that the Bankruptcy Court cannot quantify the amount of claimed costs as part of the confirmation process.

The bank's second argument intentionally distorts the voting process set forth in the Plan and Disclosure Statement by urging that the Plan provides that creditors that do not vote will be deemed to have accepted the Plan. What the Plan *actually* states is that votes which are cast, but that do not indicate acceptance or rejection, will be deemed to be an acceptance. The Plan, Disclosure Statement, and the Ballot itself, provide these instructions to creditors such that voting creditors were aware of the procedure. Further, this issue was addressed at the Disclosure Statement Hearing, with the Court indicating its approval of the language that pertained to votes cast but not indicating acceptance or rejection. Regardless, the point is moot given that there were no rejections in any class other than Class C-2 (Cathay Bank).

The bank's final argument is ironic in that the bank is complaining that the Plan provides that Court approval is required for the sale of the Property, with the bank stating that this process leaves "little oversight that will leave Cathay's claim inadequately protected." (Opposition Page 9, FN 2).

However, the inclusion of the requirement for Court approval provides exactly the opposite in that this term provides protection to creditors by mandating that the Court review and approve the terms of sale. The bank further argues that there is no standard for Court approval, despite the fact that the Plan expressly states that "The sale, and payment of costs of sale as customary in the industry, shall be approved if the terms of sale are fair and reasonable." Indeed, absent such a term, a Debtor less scrupulous that the debtor in this case could sell its property at a below market value that would not provide the maximum potential dividend to creditors. In sum, the court approval requirement is a term for the protection of creditors, provides for approval if the sale terms are fair and reasonable, and this process has been approved by case law from this district. (*See In re Caviata Attached Homes, LLC* (BC D NV 2010) 2010 Bankr. LEXIS 4270 (*requiring* a fully noticed motion for approval of property sold through the Plan)).

## V. THE PLAN IS FAIR, EQUITABLE, AND FULLY COMPLIANT WITH 11 U.S.C. § 1129(b)(2)

### A. The Plan is Not a Negative Amortization Plan

The Objection urges that the Plan is not fair or equitable because the Plan is a negative amortization plan, and the bank dedicates four pages of its brief analyzing negative amortization issues. However, this issue requires minimal discussion, as the Plan is not a negative amortization Plan. Cathay Bank raised this issue at the Disclosure Statement Hearing, and the argument was rejected by the Court as inapplicable given that the terms of the Plan do not provide for negative amortization (in fact, counsel for Debtor recalls that the bank withdrew its objection on that basis do to the inapplicability of the doctrine).

The Plan provides for interest at the market rate to Cathay Bank, with that amount stated in the Plan to be the LIBOR rate plus 2%. Thus, the post-confirmation interest rate will be fixed upon confirmation, and the plan provides for payment of interest to the bank for the duration of the Plan. Additionally, the bank will retain a first-position lien in the amount of $22,300,000 on a property valued at $46,000,000. Thus, the bank will receive market rate interest payments while also

8

retaining its lien rights, such that the claim will not increase at all during the Term of the Plan. As such, the Plan is simply not a negative amortization plan.[2]

### B. The Proposed Interest Rate is Appropriate

The Objection complains that the proposed interest rate is not satisfactory. Debtor will present expert testimony at the Confirmation Hearing[3] establishing that the proposed interest rate is appropriate based upon the factors set forth in the *Till* case, especially in light of the $1,000,000 financing provided through the Plan by Fremont which, along with cash flow from the Property, assures that all interest payments will be made pursuant to the Plan. As such, the bank will encounter absolutely no risk under the proposed Plan.

In evaluating the cram-down interest rate, the purpose is to determine the appropriate calibration of installment payments "whose total present value equals or exceeds theat of the allowed claim." (*Till v. SCS Credit Corp.* (2004) 541 U.S. 465, 469). Thus, the concept is to determine the appropriate current interest rate on a prospective basis, and conversely *is not* to "make the creditor whole." (*Id*. at 477).

In *Till*, the Supreme Court instructed that the cram-down interest rate should be calculated by starting with an ascertainable fixed rate (such as the daily U.S. Treasury Yield, Prime, or LIBOR rates), and adjusting upward according to potential risk on the loan. (*Id.* at 479). Due to the potential upward adjustments, the burden is placed on the creditor to establish the propriety of any increases in the base rate. (*Id*.) The Supreme Court endorsed this formula because, unlike other proposed approaches, the formula method (the base-plus rate) "entails a straightforward, familiar, and objective inquiry, and minimizes the need for potentially costly additional evidentiary proceedings." (*Id*.) The *Till* case also states that "courts have generally approved adjustments of 1%

---

[2] While an analysis of negative amortization plans is not warranted, Debtor does submit that the law permits negative amortization plans, and in this case Cathay Bank is protected by an equity cushion in excess of $46,000,000.

[3] The Status Conference has been set to discuss confirmation dates, including disclosure of expert witnesses, discovery cutoff dates, and other pertinent deadlines.

9

to 3% above the base rate.

The formula ("base-plus" or "risk-plus") method is that which is used in this district. (*See In re Mendoza* (BC ND Cal. 2010) 2010 Bankr. LEXIS 1308; *In re Industry West Commerce Ctr., LLC* (9th Cir. B.A.P., May 24, 2011) 2011 Bankr. LEXIS 2090 (the Ninth Circuit uses the "'formula' or 'risk plus' method [which] starts with a standard measure of risk free lending, such as the Prime Rate or the rate on treasury obligations, and adds an upward adjustment based on the debtor, the plan, and the security for the loan)).[4] In the *Mendoza* case the Bankruptcy Court applied *Till* and imposed an interest rate of 4.4% in a case involving interest payments over a three year term to be followed by a sale of the commercial property. In *Industry West* the Court imposed a 4.95% cram down interest rate, where the Plan called for interest only payments over a seven year term on a property with a 75% loan-to-value ratio. (*See also In re Caviata Attached Homes, LLC* (BC D NV 2010) 2010 Bankr. LEXIS 4270 (4.75% interest rate, and declining to accept the bank's "arbitrary adjustments")).

Under the facts at bar the bank is exposed to absolutely no risk, and therefore the LIBOR plus 2% rate is appropriate. The bank holds a secured claim in first position in the amount of $22,300,000 on a property with a value of $46,000,000, i.e., a prospective loan-to-value ratio of 48%. The bank is also to receive interest payments for the duration of the Term of the Plan such that it is receiving the present value of its claim in deferred payments (with the initial term being three years). These terms are similar to those in *Mendoza* (which imposed a cram-down interest rate of 4.4%), *Industry West* (which imposed a cram-down interest rate of 4.95%), and *Caviata* (which imposed a cram-down interest rate of 4.75%). The distinction in this case which makes the LIBOR plus 2% rate the correct rate of interest is that the Plan before the Court also includes $1,000,000 of funding from Fremont which will be used to make interest payments to Cathay Bank, such that the interest payments are virtually guaranteed, from an identified source, and there exists virtually no possibility of default.

---

[4] The *Industry West* case has not yet been published but citable as persuasive authority.

10

Further, the commercial real estate market is improving, and the Plan provides that Debtor will be making improvements to the Property such that the value of the collateral will only increase during the term of the Plan, so the collateral is not at risk. (*See Caviata* (no prejudice to bank because property will only increase during term of the plan)). The LIBOR rate as of the filing of this brief is .72%, which is higher than the current U.S. Treasury Yield (recognized in this district as a potential base rate) that is presently indexed at .69%.

The bank's Opposition proposes as staggering interest rate between 10.56% to 12.64%. The higher rate is generated by using a blended rate that is not utilized in this district, and which would not apply even if applicable because the Property is worth more than twice the amount of the secured claim such that there would be no "tiers." The interest rate proposed by the bank is fascinating in many respects. Initially, the *Till* case states that the appropriate deviation from the base rate is 1-3%. (*Till* at 801). In this case, the bank has proposed a deviation of 10-12% beyond the base rate, which is far beyond that recognized as authorized by *Till* (in fact the current Wall Street Journal Prime Rate is 3.25% such that the proposed rate would even be 7-9% beyond the Prime Rate). Further, the bank does not support its proposed deviations, but instead primarily criticizes the formula approached applied in the *Till* case.

Of course, the bank discloses the purpose behind its proposed "eye-popping" and inflated rate by stating that under its proposed rates "the Debtor certainly could not meet these interest payments." Thus, the bank is transparently arguing for an astronomical and unsupportable rate in an effort to (1) price the loan payments beyond feasibility; and (2) create for itself a windfall. Indeed, the interest rate proposed by the bank is beyond the contract rate of interest such that the bank attempts to *increase* the interest rate beyond that which it received pre-petition. However, *Till* instructs that the interest rate is designed to provide the present value in deferred payments; should not be imposed at a rate that will doom the plan; and is not intended to make the creditor whole or provide the creditor with a windfall.

11

Case: 10-60373    Doc# 135    Filed: 06/22/11    Entered: 06/22/11 17:42:21    Page 14 of 17

## C. The Terms Regarding Sales Procedures Are Appropriate

The bank next argues that (1) the Plan deprives the bank of its ability to credit bid at any sale; and (2) that Chapter 11 plans providing for the sale of property cannot be confirmed (the same argument raised previously). Neither argument warrants lengthy discussion.

Initially, the issue pertaining to credit bidding was addressed at the Disclosure Statement Hearing at which the Court indicated that (1) the issue is moot because the Plan provides for Court approval of the potential sale and the credit bidding, if sought by the bank, could be addressed when Court approval of the sale is sought; (2) the Plan makes no mention of an attempt to extinguish any credit bid rights (and the Opposition cites to no such language in the Plan); and (3) the Code does, in fact, authorize extinguishment of credit bidding rights, even though this Plan does not attempt to do so (*see In re Phila. Newspapers, LLC* (3rd Cir. 2010) 599 F.3d 298).

The second argument is the same as presented by the bank in the feasibility section, namely that plans providing for the sale of real property cannot be confirmed absent an identified seller, sale terms, and sale date. The fallacy of this argument is addressed, *supra*, and Debtor will not repeat the argument here. (*See In re Caviata Attached Homes, LLC* (BC D NV 2010) 2010 Bankr. LEXIS 4270; *In re Mendoza* (BC ND Cal. 2010) 2010 Bankr. LEXIS 1308; *In re Industry West Commerce Ctr., LLC* (9th Cir. B.A.P., May 24, 2011) 2011 Bankr. LEXIS 2090 (all cases from this Circuit decided within the past year which permit the sale of property by the end of the term of the plan)).

## D. The Bank is Receiving the Present Value of Its Claim

Citing to a decision from the Second Circuit in 1935, the bank argues that it will not receive the indubitable equivalent of its claim because, rather than receiving interest followed by a balloon payment, "a creditor wishes to get his money now, or at least the property." (Opposition 16:6-9). However, more contemporary case law states that, while the term "indubitable equivalent" (coined by the *Murel* case) has survived, the meaning of the word has evolved. (*United Sav. Asso v. Timbers of Inwood Forest Assocs.* (1988) 484 U.S. 365, 377). In the *United Savings* case, the Supreme Court explained that the entitlement to present value of the claim does not arise from the term "indubitable

12

equivalent" but rather from § Section 1129(b)(2)(A)(i)(II), which section provides for deferred cash payments (and *not* entitlement to the full principal or property "now").

In this case, Cathay Bank is retaining all lien rights, and receiving interest at the market rate during the post-confirmation period. Thus, the bank will receive exactly that to which it is entitled, namely present value of its claim in installment payments during the term of the Plan. A claimant with a $22,300,000 secured claim on a $46,000,000 property, along with interest payments, is thus receiving the present value of its claim.[5]

**E.     The New Value Provided for in the Plan Complies With Applicable Bankruptcy Law**

The Plan provides that members will continue to provide services to the Debtor without charge, and, if all claims are not paid in full, that the members must make an aggregate payment of $50,000, which payment shall be subject to overbid following a hearing on the Bankruptcy Court's law and motion calendar.

Initially, this issue will likely never come to fruition given the substantial equity in the Property. However, if the need for the members to provide new value does arise, the terms of the Plan comply with the requirements for providing new value. The new value will be new funds, of a substantial amount, of money, necessary for reorganization, and reasonable with respect to value received. (*State Street Bank v. Elmwood, Inc. (In re Elmwood, Inc.)* (D NV 1995) 182 B.R. 845, 852). In *Elmwood*, the Court stated that a nominal or gratuitous cash payment is not satisfactory, but that the 4% ratio of the cash to be provided by the members in *Elmwood*, in relation to unsecured claims, was sufficient. In this case, the $50,000 payment would be 4% of the unsecured claims in this case, the precise figure approved in *Elmwood* (but again, this estate is liquid and the need for the

---

[5] In fact, the bank is bound by its valuation, despite the fact that the valuation is quite erroneous, and as such, the Plan provides beyond that to which the bank would be entitled because the Plan provides for interest and liens on the full amount of the $23,000,000 claim. This treatment is beyond what the bank would be permitted based upon its own valuation of approximately $18,000,000. (*See Arnold & Baker Farms* (9th Cir. 1996) 85 F.3d 1415, 1423 (creditor entitled to indubitable equivalent only of its secured claim, not the unsecured portion if the claim is undersecured)).

13

payment will likely never arise).

While the bank complains that the amount of the cash to be provided, if necessary, is too low, a new value contribution is "too low" if the "equity holders obtained or preserved an ownership interest for less than someone else would have paid." (*Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. Lasalle St. P'ship* (1999) 526 U.S. 434, 453). The Plan accounts for this concern by providing for overbids such that the price that the members, or any third parties, pay will not be less less than what "someone else would have paid."

### F. The Plan Does Not Discriminate Against Any Unsecured Claim of Cathay Bank, as Cathay Bank is Fully Secured

The bank avers that it is under-secured, and that the Plan somehow discriminates as to Cathay's hypothetical unsecured claim. These arguments can be dismissed summarily. First, the value of the estate's assets exceed all claims such that all claims will be paid in full, and therefore the issue raised is moot. Second, even if the sale of the Property does not pay all claims in full, the Plan provides that unsecured claims will be paid from remaining assets, such that all unsecured claims will be on similar footing.

## VI. CONCLUSION

For the reasons set forth, each and every objection set forth by Cathay Bank must be overruled, and the Plan confirmed.

Respectfully submitted.

Dated: June 22, 2011                         COHEN AND JACOBSON, LLP

                                             By: /s/ Lawrence A. Jacobson
                                                 Lawrence A. Jacobson

14