**IT IS SO ORDERED.**
**Signed January 4, 2012**



**Arthur S. Weissbrodt**
**U.S. Bankruptcy Judge**

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re | ] Case No. 10-60373 ASW |
| CHINA VILLAGE, LLC, | ] Chapter 11 |
| Debtor. | ] |

**MEMORANDUM DECISION ON MOTIONS TO APPROVE FEE APPLICATIONS AND RECEIVER'S FINAL REPORT**

Before this Court are the final report and accounting, as well as the application for fees and expenses of Robb Evans & Associates LLC ("Robb Evans"), the superseded state court receiver for debtor, China Village, LLC ("China Village"). Also before the Court are applications for approval of fees and expenses requested by Larson & Gaston, LLP ("L&G") and the Law Offices of William P. Fennell ("Fennell"), who respectively served as Robb Evans' state court receivership and bankruptcy counsel. China Village and one of its secured creditors, Fremont Investment Property Company, LLC ("Fremont"), oppose the applications. For the reasons explained, this Court approves Robb Evans' final account and the fee

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

applications of Robb Evans, L&G and Fennell with the adjustments discussed below.

This Memorandum Decision constitutes the Court's findings of fact and conclusions of law, pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure.

**A. <u>PROCEDURAL HISTORY</u>**

On May 25, 2011, Robb Evans filed its request for approval of fees and expenses as well as a request for approval of its final report and accounting related to its service as receiver for China Village from November 1, 2009 through February 28, 2011. On the same day, L&G and Fennell filed applications for allowance and payment of compensation and reimbursement of expenses incurred as counsel for Robb Evans.

On June 9, 2011, Fremont filed objections to each of the applications. China Village filed its own objections on June 16, 2011. As a group, Robb Evans, L&G and Fennell filed replies to both Fremont's and China Village's objections on June 16 and June 17.

At a June 23, 2011 hearing on the pending applications, the Court tentatively ruled that the receiver and its counsel were entitled to fees, but directed the parties to provide additional evidence to address a factual dispute as to whether Robb Evans' late payment of certain property taxes was an act reasonably carried out within the authorized scope of the receiver's appointment. The Court also set a briefing schedule for the applicants to submit unredacted time records and any other

Case: 10-60373 ORDER Doc# 235 APPLICATION Filed: 01/04/12 Entered: 01/05/12 08:40:04 Page 2 of 27

materials needed to establish the reasonableness of the fee and expense requests. The hearing was continued to September 9, 2011.

Robb Evans, L&G and Fennell submitted supplemental declarations on July 25, 2011. These declarations authenticated time records in support of the fee requests and explained the circumstances surrounding the April 2010 property tax payment. On August 15, 2011, China Village and Fremont filed supplemental responses reiterating each of their earlier objections. On August 29, 2011, the applicants filed a joint reply together with additional declarations revising their fee requests to reflect actual time billed through August 29, 2011.

The Court continued the September 9, 2011 hearing to November 15, 2011 and, subsequently, took the November 15, 2011 hearing off calendar to allow the Court to issue a written decision.

**B. <u>FACTUAL BACKGROUND</u>**

Debtor, a single asset real estate LLC, owns a commercial shopping center in Fremont, CA consisting of 374,000 square feet of retail and restaurant space (the "property"). The property is encumbered by two deeds of trust. Cathay Bank ("Cathay") holds the senior lien. Redwood Mortgage Investors VIII ("Redwood")initially held the second deed of trust, but Fremont, the successor-in-interest to Redwood, is the current holder of the second.

In June 2009, at Cathay's request, the Alameda County Superior Court appointed Robb Evans to be the receiver of the property. With state court approval, Robb Evans retained L&G as legal counsel for all purposes associated with the receivership retroactive to the date Robb Evans was appointed.

By order dated June 24, 2009, the state court authorized Robb Evans to do all things ordinarily done by owners and operators of businesses and property similar to the property at issue. The exception was capital improvements, which required prior court approval. Robb Evans' appointment order also provided that if Robb Evans received notice of a bankruptcy case that included receivership property as part of the bankruptcy estate, Robb Evans had to determine whether Cathay intended to seek relief from the automatic stay or relief from the receiver's turn-over obligations under § 543 of the Bankruptcy Code. If Cathay intended to seek either form of relief, then Robb Evans could retain possession and preserve the receivership property pending resolution of any motion or motions that Cathay filed. If Cathay did not intend to seek either type of relief or if no motion for relief was filed within ten days after receiving notice of the bankruptcy, Robb Evans was to "immediately turn over the property to the appropriate [bankruptcy entity] and otherwise comply with 11 United States Code section 543." If Robb Evans failed to turn over the property in accordance with the appointment order, the order further provided that the receiver "shall not be paid for time and expenses after the date on which the receiver should have turned the property over."

In December 2009, when Robb Evans was preparing to pay the first installment of the 2009-2010 real property taxes for the property, Robb Evans learned that the last installment of the 2008-2009 taxes was delinquent. Robb Evans paid both installments, but subsequently, Alameda County returned Robb Evans' payment for the

Case: 10-60373  Doc# 235  Filed: 01/04/12  Entered: 01/05/12 08:40:04  Page 4 of
27

1  last installment of the 2008-2009 taxes because Redwood had

2  previously paid it.

3      On March 23, 2010, about three weeks before the April 12, 2010

4  due date for the second installment of the 2009-2010 taxes, Robb

5  Evans emailed Redwood asking to coordinate payment.  Redwood

6  responded on April 1, 2010 advising Robb Evans to call "any time to

7  discuss."  On April 5, 2010, one week before the taxes were due,

8  Robb Evans emailed counsel for Cathay to advise that the receiver

9  wanted to authorize payment of the property taxes and that there

10  was sufficient money in the property management account to cover

11  it.  The next afternoon, Redwood emailed Robb Evans to advise that

12  Cathay had asked Redwood to pay the tax installment.  Redwood asked

13  to discuss the matter with Robb Evans.  Over the next few days,

14  there were several emails that focused on Redwood's payment of the

15  second installment of the 2008-2009 taxes, but did not mention or

16  discuss the upcoming installment.  Then, on April 9, 2010, Robb

17  Evans emailed Cathay, with no copy to Redwood.  Robb Evans' email

18  informed Cathay that Redwood acknowledged receipt of a request from

19  Cathay's counsel to pay the property taxes but that Redwood

20  believed that the receiver should pay them.  Robb Evans reported

21  that Robb Evans had referred Redwood back to Cathay's counsel.

22  Robb Evans' email stated that "As we have heard no more on this, we

23  conclude that Redwood Mortgage has paid the taxes."

24      No further email or other discussion took place until April 13,

25  2010, the morning after the taxes were due.  On that morning,

26  Redwood emailed Robb Evans and inquired as to whether Robb Evans

27  had been able to resolve the property tax issue.  Robb Evans

28  responded that afternoon describing the earlier duplicate payment

MEMORANDUM DECISION ON

and stating that "the receiver understands that Redwood Mortgage was to pay the second installment." Redwood replied that afternoon, acknowledging that Redwood had paid the 2008-2009 delinquency as a condition of a forbearance agreement with Cathay, but further stating,

> "as discussed with you previously, it is [Redwood's] understanding that the property taxes are an operating expense and as such would be paid out of operating income. We do not have an agreement or understanding to pay the second installments of the 2009/2010 property taxes and expect that the receiver will pay these from the cash reserves, as was done for the first installments."

The morning of April 26, 2010, Robb Evans emailed both Redwood and Cathay to confirm that the receiver had not made the property tax payment that was due on April 12. Several email exchanges ensued where Cathay threatened to foreclose if Redwood did not make the tax payment and Redwood maintained that the receiver was obligated to pay because the property had earned sufficient income to cover the payment. Robb Evans received and reviewed a copy of the Cathay-Redwood forbearance agreement and determined that under its terms, Redwood was required to pay the taxes only if China Village's operating funds were insufficient to cover the payment. Robb Evans paid the property taxes that same day.

Six months later, on October 4, 2010, China Village filed its chapter 11 petition. On November 2, 2010, Cathay filed two motions, one for relief from the automatic stay and the second to excuse compliance with the turnover requirements of Bankruptcy Code § 543. The United States Trustee, China Village and Redwood opposed the motion to excuse the turnover of estate property. On December 7, 2010, the Court heard and orally denied the turnover

MEMORANDUM DECISION ON

1  motion without prejudice to the filing of a motion to appoint a

2  chapter 11 trustee.  No written order was entered.

3     The next day, December 8, 2010, Victor Cosentino, an attorney

4  with L&G, emailed China Village's counsel, Lawrence Jacobson,

5  requesting a conference to coordinate transfer of the property.  On

6  December 17, Cosentino again emailed Jacobson summarizing the

7  anticipated receiver's fees and expenses as well as the anticipated

8  amount to be turned over.  Cosentino advised that the receiver

9  wanted to coordinate having the property manager begin working for

10  debtor as quickly as possible and again requested a telephone

11  conference with Jacobson so the turnover could be coordinated.

12  Cosentino warned that "If the turnover does not occur before

13  Thursday 12/24, it may not get done until early in the new year"

14  due to the holidays and Cosentino's absence from the office.

15     On December 21, Jacobson responded with an email commenting

16  that China Village agreed with Robb Evans that Robb Evans should

17  turn over all funds and property to China Village because the

18  Bankruptcy Court declined to excuse compliance with the turnover

19  requirements of Bankruptcy Code § 543.  Jacobson also advised that

20  China Village wanted to keep the property management company in

21  place and asked for contact information to reach the property

22  manager directly.

23     On January 11, 2011, Cosentino emailed Jacobson inquiring

24  whether China Village was ready "to do this turnover" and requested

25  wiring instructions.  Jacobson responded with bank information

26  about 4:45 p.m. on Friday afternoon, January 14, 2011.  Cosentino

27  replied a few minutes later, stating that Robb Evans would arrange

28  for the transfer of money "ASAP," and guessing that the transfer

1  would be the following Tuesday (January 18) because that Monday was

2  a Federal holiday.   Cosentino also advised that he would tell the

3  property manager to contact Jacobson so the property manager could

4  arrange to start taking instructions from China Village as of the

5  date of transfer.

6      On January 18, 2011, however, Cosentino emailed Jacobson to

7  advise that the property manager had been trying to reach Jacobson

8  to arrange the transfer of the management services pursuant to

9  written contract.   Cosentino stated that the receiver was agreeable

10  to proceeding with the turnover either via an interim property

11  management contract between the property manager and China Village

12  or via the receiver's termination of the property manager's

13  services with China Village's assumption of day to day

14  responsibility for the property.   Cosentino requested instruction

15  on how China Village wanted to proceed and relayed the receiver's

16  desire to complete the turnover as soon as possible but also to

17  ensure coordination.

18      On February 1, 2011, L&G again emailed debtor's counsel asking

19  whether the property management contract had been approved and

20  urging, "can we conclude this turnover?"

21      On February 7, 2011, the receiver filed a notice that it was

22  retaining Fennell as bankruptcy counsel to assist in the turnover

23  of estate property to debtor and other bankruptcy issues.   On

24  February 11, 2011, Fennell filed an ex parte request to shorten

25  time for hearing on a motion to compel debtor's receipt of turnover

26  of the receivership property.   Shortened time was denied, and the

27  Court indicated that scheduling of the motion to compel receipt of

28

MEMORANDUM DECISION ON

turnover would be discussed at a disclosure statement hearing set for February 18, 2011.

On February 15, 2011, China Village filed a status conference statement summarizing the status of the turnover. China Village conceded that Robb Evans was "ready and desirous of completing the turnover," but that the process had been delayed by what China Village characterized as a "minor procedural dispute" regarding China Village's intent to engage the continued services of the receiver's property manager. China Village believed that the property manager's continued services would provide comfort to the secured creditors and eliminate the need for lengthy and costly cash collateral litigation. China Village reported that after China Village had negotiated an agreement with the property manager and a corresponding cash collateral stipulation, Redwood expressed reservations concerning the specific property manager. China Village informed the Court that China Village was in the process of resolving Redwood's concerns.

A day before the scheduled disclosure statement hearing, Jacobson emailed L&G, Fennell, as well as counsel for Cathay and Redwood. Jacobson advised that Redwood had approved the appointment of the property manager and the cash collateral stipulation. Jacobson concluded that "I presume that the receiver and property manager can accomplish the turnover promptly after the Court approval of the stipulation and application to appoint."

On February 25, 2011, Jacobson emailed the signed cash collateral order and the executed property management agreement to Robb Evans, Redwood and Cathay. His email stated, "I presume that this should allow for completion of the turnover."

The turnover was completed March 1, 2011, two business days later.

**C.  LEGAL ANALYSIS**

 **1.  Receiver's Final Account and Fee Application**

As a state court receiver, Robb Evans is a "custodian" within the meaning of § 101(11)(C) of the Bankruptcy Code.  In re Snergy Properties, Inc., 130 B.R. 700, 703 (Bankr. S.D.N.Y. 1991).  Under § 543 of the Bankruptcy Code, when a custodian acquires knowledge of a bankruptcy case involving property in the custodian's possession, three obligations arise.  First, the custodian must refrain from making any disbursement of, or otherwise administering, any property of debtor "except such action as is necessary to preserve such property."  11 U.S.C. § 543(a).  Second, the custodian must deliver to the "trustee" any property of debtor that is in the custodian's possession at the time that the custodian learned of the bankruptcy.  Id. § 543(b)(1).  Third, the custodian must promptly file an accounting of any property that was ever in the custodian's control.  Id. § 543(b)(2) and Fed. R. Bankr. P. 6002(a).

Once a superseded custodian files its accounting, Bankruptcy Code § 543(c) authorizes the Court to review the actions and the accounting of the custodian.  As part of its review, the Court must protect all entities to which the custodian has become obligated and provide the custodian with reasonable compensation for services rendered as well as expenses incurred.  Id. § 543(c)(1)-(2).  The Court also has an obligation to surcharge the custodian for any improper or excessive disbursement (other than a disbursement that

has been made in accordance with applicable law or that has been approved by a court of competent jurisdiction before the commencement of the bankruptcy).  Id. § 543(c)(3).  In short, receivership property becomes property of debtor's bankruptcy estate upon the filing of the petition, and decisions affecting the property fall under the domain of this Court. In re Sundance Corp., Inc., 149 B.R. 641, 650 (Bankr. E.D. Wash. 1993).

In this case, Robb Evans completed delivery of the receivership property to China Village on March 1, 2011.  Its May 25, 2011 final report, accounting and request for fees, as supplemented through June 17, 2011, is before this Court.  China Village and Fremont raised a variety of objections to the final report/account and the fee application based on vagueness, lack of time records and the inclusion of an estimated request for future fees.  Robb Evans' time records through June 17, 2011, as well as a supplemental declaration of the deputy receiver adequately explain the tasks performed by the receiver and differentiate the role played by the property manager.  As a result, the Court overrules the objections based on vagueness and lack of time records.  Three objections remain: 1) whether Robb Evans should be surcharged for $17,875.24 in real estate tax penalties and interest paid by the receivership estate in April 2010; 2) whether the Court should deny all fees incurred following this Court's December 7, 2010 order denying the request to excuse Robb Evans from its turnover obligations under § 543; and 3) whether the amount of fees that Robb Evans has requested is excessive and unreasonable, including the request for $7,132 in estimated fees and expenses that have been or will be incurred since June 17, 2011.

Case: 10-60373   Doc# 285   Filed: 01/04/12   Entered: 01/05/12 08:40:04   Page 11 of
27

At the hearing on June 23, 2011, this Court recognized that under California law, "Ordinarily, a receiver is not individually liable for acts reasonably carried out within the authorized scope of the receiver's appointment." 11 Miller & Starr, <u>Cal. Real Estate</u> (3d ed. 2009, Supp. 2011), §33:18. The Court directed the parties to submit additional declarations or other evidence to flesh out whether the late payment of taxes, even if negligent, was an act that fell within this general rule. Further research, however, reveals that California courts also recognize an exception to the general rule and will hold a receiver personally liable for misconduct or mismanagement of the receivership estate. <u>See</u> <u>Credit Managers Ass'n of Southern California v. Kennesaw Life and Acc. Ins. Co.</u>, 25 F.3d 743, 751 (9th Cir. 1994)(discussing cases supporting both the rule and the exception).

To determine whether the rule or the exception is applicable to a particular set of circumstances, the California courts look to the relationship between the claim asserted and the receivership estate. When the cause of action is independent of any interest in the estate and could be asserted by a stranger to the receivership estate, the general rule applies. <u>See</u>, <u>e.g.</u>, <u>Chiesur v. Superior Court in and for Los Angeles County</u>, 76 Cal. App. 2d 198, 201 (1946)(third party sought permission to sue a receiver of an apartment building for personal injuries caused by failure to maintain the premises); <u>Sealite, Inc. v. Finster</u>, 149 Cal. App. 2d 612, 618 (1957)("a receiver is liable to persons not beneficially interested in his receivership, in his official capacity only"), <u>citing</u> <u>McNulta v. Lochridge</u>, 141 U.S. 327, 12 S. Ct. 11 (1891) and <u>Chiesur</u>, 76 Cal. App. 2d at 201. However, when an injury or claim

Case: 10-60373   Doc# 285   Filed: 01/04/12   Entered: 01/05/12 08:40:04   Page 12 of 27

arises because the receivership estate, in which the claimant has a beneficial interest, has been diminished, California courts have found that a receiver can be held personally liable for losses due to the receiver's mismanagement. <u>Rochat v. Gee</u>, 137 Cal. 497 (1902)(in action by two partners for dissolution of partnership, receiver surcharged for creditors' seizure of partnership assets during the receivership); <u>MacMorris Sales Corp. v. Kozak</u>, 249 Cal. App. 2d 998 (1967)(used automobile sales business stated claim against its receiver for allegedly liquidating cars at unreasonably low prices, but company failed to provide sufficient evidence that a better price could have been obtained). In <u>State Through State Bd. of Equalization v. Stewart</u>, 272 Cal. App. 2d 345 (1969) a receiver, who operated a hotel and restaurant, collected sales tax from customers and withheld unemployment disability taxes from employees' paychecks. The receiver failed, however, to segregate the collected amounts for the benefit of the state and instead, paid all receivership assets to other creditors. In settling the receiver's final account, the court held the receiver individually liable for the unpaid taxes stating, "A court-appointed fiduciary may be surcharged for failure to pay taxes due in operating the business of an estate." In <u>Aviation Brake Sys., Ltd. v. Voorhis</u>, 133 Cal. App. 3d 230, 235 (1982), the court similarly recognized that a receiver may be personally responsible for losses to a receivership estate. There, a company sued its former receiver for failing to discharge his duties faithfully based on a variety of misconduct. Although the appellate court upheld dismissal of the complaint, it did so only on *res judicata* grounds because the company first raised the claims after the final account had been

Case: 10-60373    Doc# 235    Filed: 01/04/12    Entered: 01/05/12 08:40:04    Page 13 of
27

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

approved and the receiver discharged. The court specifically accepted that if the claims had been addressed during the proceedings on the receiver's final account, the receiver could have been surcharged for losses to the receivership estate based upon the receiver's misconduct or mismanagement.

In the case before the Court, there is no doubt that China Village and Fremont, as the debtor and the holder of the second deed of trust against the property, were interested in preserving the receivership estate. The question then is whether Robb Evans' failure to pay taxes on a timely basis constitutes mismanagement of the receivership estate. If the accrual and payment of penalties and interest resulted from the receiver's mismanagement, then Robb Evans should be surcharged with the loss resulting from its mishandling of the tax payment. Based on the evidence submitted, the Court concludes that Robb Evans erred when it did not ensure that the taxes were paid on time.

Robb Evans was aware that Redwood had paid delinquent amounts related to the 2008-2009 property taxes and wanted to avoid future duplicate payments. Nevertheless, Robb Evans has conceded that it generally believed Robb Evans was responsible for paying real estate taxes. Robb Evans also knew that the receiver, not Redwood, had paid the first installment of the 2009-2010 taxes. Emails provide further evidence that, at one point, Robb Evans explicitly requested Cathay's concurrence with Robb Evans' intent to pay the second 2009-2010 installment.

Confusion ensued after Cathay suggested that Redwood might be responsible for the taxes. With hindsight, Robb Evans asserts that Redwood caused the confusion because Redwood never affirmatively

Case: 10-60373    Doc# 235    Filed: 01/04/12    Entered: 01/05/12 08:40:04    Page 14 of
27

stated that Redwood would not pay the taxes. Nevertheless, just three days before the taxes were due, in an email sent only to Cathay, Robb Evans acknowledged that Redwood believed that the receiver, not Redwood was responsible for paying the taxes. In light of Redwood's known position, it was unreasonable for Robb Evans, the fiduciary of the receivership estate, to simply conclude that Redwood had paid the taxes, especially without providing Redwood with notice of, and an opportunity to object to, the receiver's assumption.

Current real estate taxes are ordinary expenses of operating property. <u>Schreiber v. Ditch Road Investors</u>, 105 Cal. App. 3d 675, 680-81 (1980). Because Robb Evans was the receiver responsible for operating the property, Robb Evans had a fiduciary obligation to pay the second installment of the 2009-2010 real estate taxes. <u>Id</u>. ("Receivers are obligated to pay all taxes on real property in their possession which fall due during the time they are in possession as receivers."). As a result, Robb Evans had a duty either to obtain confirmation of Redwood's intent to pay or to pay the taxes timely to avoid the accrual of interest and penalties. It did neither. For this lapse, the receiver will be surcharged the amount of $17,875.24, which represents the amount of interest and penalties that accrued when the taxes were not paid timely.

Turning to the next issue, the Court is not inclined to deny all fees subsequent to the December 7, 2010 denial of Cathay's motion to excuse compliance with the turnover requirement of § 543 of the Bankruptcy Code.

Fremont and China Village assert that once Cathay's motion to excuse turnover was denied in open court, Robb Evans had no

Case: 10-60373 Doc# 235 Filed: 01/04/12 Entered: 01/05/12 08:40:04 Page 15 of 27

authority to do anything except to turn over the property to China Village.  They further contend that turning over property is a simple task and should not have required significant work on the part of either Robb Evans or its counsel.  Robb Evans responds that it acted promptly to arrange for the transfer of the property but was frustrated by China Village's lack of cooperation.  As a result, Robb Evans and its counsel incurred significant fees both to operate and protect the property pending the turnover and to obtain China Village's cooperation to ensure a smooth transition.

Bankruptcy Code § 543(b)(1), provides that a custodian, unless otherwise excused, shall:

> deliver to the trustee any property of the debtor held by or transferred to such custodian, or proceeds, product, offspring, rents, or profits of such property, that is in such custodian's possession, custody, or control on the date that such custodian acquired knowledge of the commencement of the [bankruptcy] case.

11 U.S.C. § 543(B)(1).  Despite the apparent automatic nature of the turnover obligation, one leading bankruptcy treatise explains that,

> courts have recognized that this provision contains no time limit in which property must be turned over.  As a practical matter, most custodians retain the property until requested or ordered to turn it over to the trustee or debtor-in-possession.

4 Norton Bankruptcy Law and Practice (3d ed. 2008), § 62.10.  On one hand, efforts expended by a state court receiver resisting an involuntary bankruptcy have been found to be non-compensable because they provided no benefit to the estate.  In re Lake Region Operating Corp., 238 B.R. 99, 102 (Bankr. M.D. Pa 1999).  On the other hand, reasonable compensation for expenses incurred in preparation for or in effectuating a turnover is allowable under Code § 543(c)(2), which mandates that the court "shall provide for

Case: 10-60373  Doc# 235  Filed: 01/04/12  Entered: 01/05/12 08:40:04  Page 16 of 27

the payment of reasonable compensation for services rendered and cost and expenses incurred" by a superseded custodian.  11 U.S.C. § 543(c)(2); <u>In re Posadas Associates</u>, 127 B.R. 278, 280 (Bankr. D. N. M. 1991).  The question then is whether the fees that Robb Evans incurred were reasonably necessary to preserve the receivership estate or to effectuate the turnover.

On December 7, 2010, this Court denied Cathay's motion to excuse Robb Evan's turnover obligations ruling that Robb Evans had to comply with the turnover requirements of Bankruptcy Code § 543. The day after that ruling, Robb Evans' counsel emailed China Village's counsel to begin a smooth and coordinated return of the property to debtor.  On December 21, 2010, China Village's counsel advised Robb Evans' counsel that it wanted to retain the property manager that the receiver had been using.  As later reported in a February 15, 2011 status conference statement, China Village believed that the property manager's continued services would comfort the secured creditors and prevent expensive cash collateral disputes.  Thereafter, all parties began working toward a coordinated turnover with both the property manager and an approved cash collateral stipulation in place.

There is no evidence that Robb Evans ever resisted turning over the property.  To the contrary, emails from late December 2010 through early February 2011 evidence Robb Evans' growing frustration with the sluggishness of the process.  Robb Evans' counsel repeatedly inquired as to whether China Village was ready to conclude the turnover.  By early February, Robb Evans hired bankruptcy counsel to assist in the turnover, and bankruptcy counsel immediately attempted to schedule a motion to compel China

Village to accept receipt of the turnover. While the Court denied a request to hear the motion on shortened time, the Court indicated that a schedule for the motion would be discussed at an already scheduled disclosure statement hearing set for February 18. On February 15, China Village reported to the Court that Robb Evans was "ready and desirous of completing the turnover," but that Redwood's concerns over the property manager had resulted in a "procedural dispute" that had delayed the process. By February 18, China Village had reached an agreement with Redwood, and on February 25, 2011, China Village's counsel notified the parties that it had an executed property management agreement in place and that the Court had signed an order approving the parties' cash collateral stipulation, which "should allow for completion of the turnover." Robb Evans turned over the property two business days later.

This evidence indicates that Robb Evans's efforts were directed at facilitating the turnover, not opposing it. The contemporaneous emails and court documents indicate that all parties believed that the turnover should occur only after debtor retained the property manager and had a cash collateral stipulation in place. Under these circumstances, there is no basis for a wholesale denial of all fees and costs associated with the services of the receiver following the denial of Cathay Bank's motion to excuse turnover. The better question under § 543(c) is whether the tasks that the receiver performed were necessary and whether the fees incurred were reasonable. The Court addresses those issues below in conjunction with the Court's discussion of the fee requests of Robb Evans and its counsel.

MEMORANDUM DECISION ON

**2. Reasonableness and Necessity of Requested Fees and Expenses**

Bankruptcy Code § 503(b) governs the award of compensation to both the receiver and its counsel. Under § 503(b)(3)(E), the actual and necessary expenses of a custodian superseded under § 543 of the Bankruptcy Code are entitled to treatment as an administrative expense. As discussed above, those expenses include post-petition fees and expenses that were reasonably incurred in effectuating the turnover. Further, fees and expenses of attorneys retained by a superseded custodian are paid as an administrative expense under § 503(b)(4) which provides,

> reasonable compensation for professional services rendered by an attorney or an accountant of an entity whose expense is allowable under subparagraph (A), (B), (C), (D), or (E) of paragraph (3) of this subsection.

11 U.S.C. § 503(b)(4).

Robb Evans' fee request and that of its counsel have been submitted in piecemeal fashion. The original applications, filed May 25, 2011, included estimated amounts for fees expected to be incurred to close the receivership. Since that time, there have been two rounds of supplemental declarations. Robb Evans' supplement provides actual time through June 17, 2011 and requests $7,132 in estimated fees and expenses to close. Counsel for Robb Evans have each provided declarations establishing actual time incurred through August 29, 2011. Based on the applicants' submissions, the following requests are before the Court:

1. The receiver seeks a total award for fees and expenses of $89,636.55 of which $44,433.95 remains unpaid. Of the unpaid amount, $13,686.68 of the request is related to actual and

Case: 10-60373   Doc# 235   Filed: 01/04/12   Entered: 01/05/12 08:40:04   Page 19 of 27

1    estimated fees or expenses incurred after the receiver's final

2    report and request for compensation.

3    2.   L&G, the receiver's state court counsel, seeks a total award

4    for fees and expenses of $43,520.79 of which $40,047.48 is unpaid

5    ($23,441.63 in the original application plus $16,605.85 incurred

6    after the application period).   L&G incurred $24,055.58 of the

7    total fees and expenses after the receiver turned over possession

8    of the receivership property.

9    3.   Fennell, the receiver's bankruptcy counsel, seeks a total award

10    for unpaid fees and expenses of $26,984.37 ($15,397.91 in the

11    original application plus $11,586.46 incurred after the application

12    period).   Fennell incurred $17,428.23 of the total fees and

13    expenses after the receiver turned over possession of the

14    receivership property.

15         The Court turns first to Robb Evans' fee request.   Fremont and

16    China Village assert that the receiver's fees incurred after

17    December 7, 2010 are unreasonable and excessive in relation to the

18    simple task of turning over the property to debtor.   As discussed

19    above, despite Robb Evans' immediate efforts to turn over the

20    receivership property, the turnover process was not as simple as

21    anticipated.   While the receiver promptly initiated discussions to

22    arrange for the turnover, all the parties believed that the

23    turnover should take place in a coordinated fashion.   While the

24    parties worked toward that end, the receiver properly continued to

25    operate and protect the property.   The receiver's time records from

26    December 2010 through May 6, 2011 demonstrate that Robb Evans'

27    activities were limited to communicating with its counsel regarding

28    arrangements for the turnover, overseeing the property manager's

MEMORANDUM DECISION ON

work and, following the turnover, preparing the receiver's final report and account. There is no evidence before the Court that the receiver performed any tasks beyond what was necessary to preserve the property for ultimate turnover to debtor. The Court overrules the objection that the receiver's actual time up through its final account was excessive or unnecessary.

Robb Evans' original fee request included estimated fees and expenses that Robb Evans expected to incur after May 6, 2011. In July 2011, when Robb Evans submitted its time records, it updated its request to include actual time through June 17, 2011. However, Robb Evans' request still includes estimated fees and expenses of $7,132 for tasks performed or expected to be performed after June 17. In the period between May 6, 2011 and June 17, 2011, Robb Evans' time records reflect that the receiver spent time revising and finalizing the final report and account. Robb Evans also gathered information for its counsel to use in responding to the objections to the final report and account. This time incurred to prepare and defend its fee application is compensable.

With respect to the post June 17 time period, however, the receiver continues to estimate its fees. Robb Evans' reliance on estimated fees even after this Court explained that it needed evidence to evaluate the reasonableness of any fee request is, quite simply, indefensible. Because there is no evidence to support the reasonableness of the estimated fees, Robb Evans' request for $7,132 in estimated fees and expenses will be disallowed.

Turning next to the applications of L&G and Fennell, China Village first contends that L&G is not entitled to **any** compensation

1   at all because a conflict of interest arose when L&G assisted with

2   a declaration in support of Cathay's motion for relief from stay.

3   However, as discussed above, the receiver's counsel is entitled to

4   reasonable compensation under § 503(b)(4) of the Bankruptcy Code.

5   There is no requirement that a superseded receiver's counsel be

6   either appointed by the court or disinterested under Bankruptcy

7   Code § 327 to be entitled to compensation for post-petition

8   services.  In re 245 Associates, LLC, 188 B.R. 743, 748 (Bankr.

9   S.D.N.Y. 1995); Snergy Properties, 130 B.R. at 704-05.

10      China Village and Fremont also urge that counsels' applications

11  are duplicative, that L&G, as receivership counsel, should not have

12  incurred any time related to the bankruptcy case, that Fennel's

13  time was almost entirely related to an unnecessary motion to compel

14  China Village to accept turnover of the receivership property, that

15  the time incurred in both applications is generally excessive, and

16  that the post-application time spent defending the fee applications

17  is especially unreasonable.

18      The fact that Robb Evans had two sets of counsel is not, by

19  itself, unreasonable.  Each had its own area of expertise and under

20  the circumstances of this case, there was a need to have

21  coordinated advice with both counsel providing advice on Robb

22  Evans' course of action.  Nevertheless, when two sets of counsel

23  are present, it is important to review the tasks performed to weed

24  out unnecessary duplication in the work performed.

25      From December 2010, when the Court directed Robb Evans to

26  comply with the turnover requirements of Bankruptcy Code § 543,

27  through March 1, 2011, when the turnover took place, L&G's time

28  records disclose that L&G spent its time communicating with the

receiver, debtor's counsel and the property manager to coordinate the turnover and address some insurance issues regarding the property. In late January and February, L&G began speaking with Fennell to obtain specialized bankruptcy advice to facilitate the turnover. L&G spent some time communicating with the property manager on property-related issues and small amounts of time reviewing materials in connection with the motion to compel turnover that bankruptcy counsel prepared. Finally, L&G incurred approximately an hour of time related to the receiver's limited opposition to debtor's disclosure statement.

During the same time period, Fennell spent time providing advice on how to facilitate turnover of the receivership property through the bankruptcy case. Fennell communicated with both Robb Evans and L&G regarding the turnover. Fennell prepared a motion to compel turnover and a limited opposition to debtor's disclosure statement. Fennell also appeared before the Bankruptcy Court at a disclosure statement hearing. Finally, Fennell requests $1,080 related to time spent traveling from San Diego to San Jose for a hearing before this Court. Time spent on air travel is not compensable unless those hours actually were spent working. Because the time records indicate that Fennell's travel time was not spent working, the request for $1,080 will be disallowed.

There is no indication that the efforts of L&G and Fennell were duplicative during this time period. Instead, the time records suggest that counsel complemented each other's work, each contributing its own expertise to the issues at hand. Further, the Court overrules the objection to compensating Fennell for work on the motion to compel acceptance of the turnover. While the

1    motion was never heard, the receiver's motion encouraged debtor to

2    finalize the cash collateral stipulation and the property

3    management agreement which ultimately led to the receiver's

4    turnover.  Under the circumstances, it was not unreasonable for

5    Fennell to prepare the receiver's motion to compel turnover.

6        Following the completion of the turnover but prior to its fee

7    application, L&G counseled Robb Evans with respect to a property

8    tax payment that the Court authorized Robb Evans to pay.  L&G also

9    assisted Robb Evans with preparation of its final report, account

10   and fee application.  Further, L&G spent several hours related to

11   its own fee application and 2.3 hours related to debtor's plan and

12   disclosure statement in the bankruptcy case.  As receivership

13   counsel, there is no apparent reason for L&G's review of the plan

14   and disclosure statement.  The $690 associated with that task will

15   be disallowed.  Additionally, L&G requests 3.1 hours for the

16   clerical task of categorizing its time records.  Because clerical

17   time is overhead rather than compensable professional time, the

18   $930 related to this clerical task also will be disallowed.

19       During the same two month period from March 1, 2011 through

20   early May, Fennell remained involved in this bankruptcy case to

21   ensure that debtor's plan did not preclude payment of the fees and

22   expenses of the receiver or its counsel.  Fennell also spent

23   approximately three hours assisting Robb Evans and L&G with the

24   final report and account, as well as their fee applications.  The

25   Court concludes that this time was reasonable to help the receiver

26   and its state court counsel with filing their applications in the

27   Bankruptcy Court.

28

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

1    The final issue with respect to the applications of L&G and
2    Fennell is the time that they have incurred since their
3    applications were filed.  The post-application period fees raise
4    several concerns.  First, the amounts listed in the notice that
5    went out to creditors regarding counsels' fee requests reflected
6    the amount requested in their original fee applications plus an
7    estimated reserve of $1,000 for each counsel to cover fees for any
8    follow-up matters subsequent to the time covered by the fee
9    application.  Both L&G and Fennell now request fees significantly
10   in excess of the amounts that were noticed out to creditors.  For
11   that reason alone, the fees beyond the estimated $1,000 must be
12   denied.

13   Even if the requested fees did not exceed the amounts noticed
14   to creditors, a review of the time records regarding those post-
15   application fees reveals that both sets of counsel collaborated
16   with Robb Evans on two rounds of briefing in support of the final
17   report and the fee applications.  Although joint briefs were filed,
18   the collaboration led to over $28,000 in counsel fees that were
19   incurred after the final account and fee applications were filed.
20   This sum is unreasonable in light of the size of the briefs and the
21   issues addressed.  While there was one substantial declaration
22   relating the facts surrounding the late payment of taxes, other
23   declarations merely authenticated time records or invoices that
24   were attached to the declarations.  As a result, all attorneys fees
25   related to work performed in the post-application period in excess
26   of the $1,000 specifically reserved for follow-up matters are
27   denied without prejudice to a supplemental application supported by
28   appropriate evidence.

Case: 10-60373    Doc# 285    Filed: 01/04/12    Entered: 01/05/12 08:40:04    Page 25 of
27
25

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

**D.   CONCLUSION**

For the reasons explained, the Court finds as follows:

1.   Subject to a surcharge of $17,875.24 for the penalties and interest associated with the late payment of the second installment of the 2009-2010 property taxes, Robb Evan's final account is approved, and Robb Evans is discharged as the receiver for China Village.

2.   Robb Evans' request for fees and expenses is approved in the total amount of $82,504.55, of which $37,301.95 remains unpaid. After application of the surcharge of $17,875.24, Robb Evans is entitled to a net award of $19,426.71.

3.   L&G's application is approved in the total amount of $26,294.94 for fees and costs.  After application  of prior payments, $22,821.63 remains unpaid.

4.   Fennell's application is approved in the amount of $15,317.91 for unpaid fees and costs.

*** END OF ORDER***

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

1

2

3

4

<u>Court Service List</u>

5

William P. Fennell
Tracy L. Schimelfenig
LAW OFFICE OF WILLIAM P. FENNELL, APLC
1111 Sixth Ave., Suite 404
San Diego, CA 92101

Victor J. Cosentino
LARSON & GASTON, LLP
200 S. Los Robles Ave.
Suite 530
Pasadena, CA 91101

6

7

8

9

Dennis D. Miller
Eugene Chang
STEIN & LUBIN LLP
600 Montgomery St.
14th Floor
San Francisco, CA 94111

Lawrence A. Jacobson
Sean M. Jacobson
COHEN AND JACOBSON, LLP
900 Veterans Blvd., Suite 600
Redwood City, CA 94063

10

11

12

13

Bernard R. Given II
FRANDZEL ROBINS BLOOM & CSATO, LC
6500 Wilshire Blvd., 17th Floor
Los Angeles, CA 90048-4920

Nanette Dumas
OFFICE OF THE UNITED STATES TRUSTEE
280 S. First St.
San Jose, CA 95113

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MEMORANDUM DECISION ON